No. 47,166

EMPORIA STATE BANK AND TRUST COMPANY, *Appellees,* v. HAROLD L. MOUNKES and BETTY L. MOUNKES, *Appellants.*

(519 P. 2d 618)

Opinion filed March 2, 1974.

*C. Bruce Works,* of Topeka, argued the cause and was on the brief for the appellants.

*James W. Putnam,* of Putnam and Mankin, of Emporia, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: The Emporia State Bank and Trust Company brings this action to foreclose a real estate mortgage. The defendants,

Mr. and Mrs. Mounkes, filed an answer and cross petition. The court rendered personal judgment against the defendants for $1651.51 and a judgment *in rem* for $5911.53. The mortgage was foreclosed as to both sums. Judgment was also entered in favor of the bank on the defendants' cross petition. Mr. and Mrs. Mounkes have appealed.

No dispute exists concerning the facts. On February 13, 1963, Mr. and Mrs. Mounkes executed their promissory note to the bank in the amount of $12,500, and secured the same by a mortgage on an Emporia property which was their homestead. The face of the note indicates that monthly payments were started April 1, 1963. When the present proceedings were commenced the indebtedness had been reduced to $1573.57.

On February 27, 1971, some eight years after the mortgage was given, Mr. Mounkes executed his personal note to the bank for $5100. We were advised on oral argument that this loan was procured by Mr. Mounkes to assist a son in starting a restaurant business. A third note in the amount of $3711 was executed by Mr. Mounkes August 6, 1971. This loan was secured by a security agreement covering a 1970 Ford car and had been paid down to some $529 by the time the present action was filed.

To complete the factual picture, Mr. and Mrs. Mounkes were adjudicated bankrupts August 25, 1971, and both were duly discharged January 19, 1972.

In its petition the bank prayed for the foreclosure of its mortgage not only as to the balance due on the original note executed by Mr. and Mrs. Mounkes in 1963, but also as to the amounts alleged to be unpaid on the two subsequent notes signed by Mr. Mounkes in 1971. The bank's contention in such regard was and is predicated on a so-called dragnet provision contained in the mortgage. It reads as follows:

"This mortgage is given to secure payment of the sum of Twelve Thousand Five Hundred & no/100 Dollars ($12,500.00) and interest thereon, according to the terms of promissory note/s this day executed and subsequently to be executed by the mortgagors to the mortgagee, and all other sums which may hereafter be owing to the mortgagee by the mortgagors or any of them, however evidenced; it being understood and agreed that the mortgagee may from time to time make loans and advances to the mortgagors or any of them and that all such loans and advances and the interest thereon will be secured by this mortgage: provided that the aggregate principal amount of the loans and advances hereunder shall at no time exceed the amount hereinbefore stated."

The trial court agreed with the bank's position so far as the

$5100 note was concerned and decreed that the balance due thereon as well as the balance due on the original note be made a lien on the mortgaged property. The court further ordered the mortgage foreclosed as to both amounts, which then totaled $7563.10. In so doing, the court forebore to enter personal judgment on the $5100 note signed by Mr. Mounkes, but granted judgment *in rem* against the real estate for the face amount thereof, plus interest. No judgment appears to have been rendered on the third note secured by the Ford car.

We should say at this point the defendants concede that the unpaid balance of the original note is secured by their mortgage of February 13, 1963. However, they take a quite different position with respect to the subsequent note signed by Mr. Mounkes on February 27, 1971, and they rely heavily on our opinion in *Stockyards National Bank v. Capitol Steel & Iron Co.*, 201 Kan. 429, 441 P. 2d 301. Before examining that decision in depth, we pause for a look at some guiding principles.

The dragnet syndrome is not a stranger in banking circles. Indeed, it has long found legislative recognition in what is now K. S. A. 1973 Supp. 9-1101 (4). Moreover, we apprehend that a future advances clause in a mortgage may provide an extremely useful and practical tool in facilitating many business and commercial type operations which involve frequent or continuing advancement of funds and extension of credits. (*First Nat. Bank of Guntersville v. Bain*, 237 Ala. 580, 188 So. 64.) One example, among others which come readily to mind, is found in the construction or building trade where the open end or dollar mortgage serves as a convenient device in facilitating the flow of funds at minimal expense. (See *Potwin State Bank v. Ward*, 183 Kan. 475, 327 P. 2d 1091.) Some of the advantages which accrue both to the lender and to the borrower are pointed out by Professor Blackburn in Mortgages to Secure Future Advances, 21 Mo. Law Review 209.

In the great majority of cases where the question has arisen, the courts have held that future advancements made pursuant to a dragnet or open end type of mortgage came within the contemplation of the parties and were thus secured thereby. Cases to this general effect are to be found among our own reports. (*State Bank v. Tinker*, 131 Kan. 525, 292 Pac. 748; *Union State Bank v. Chapman*, 124 Kan. 315, 259 Pac. 681.)

Despite recognition by both judicial and legislative bodies that

the dragnet mortgage fills a contemporary need in the complex world of business, it is not a favorite of the law and is subject to interpretation and construction. As the Iowa Supreme Court so aptly observed in *First v. Byrne,* 238 Iowa 712, 28 N. W. 2d 509, 172 A. L. R. 1072, " 'Dragnet' clauses are not highly regarded in equity. They should be 'carefully scrutinized and strictly construed.' " (pp. 715, 716.) This view was mirrored in *Berger v. Fuller,* 180 Ark. 372, 377, 21 S. W. 2d 419, 421, where the Supreme Court of Arkansas, in speaking of a mortgage having a future advancements clause, said:

". . . Mortgages of this character have been denominated 'anaconda mortgages,' and are well named thus, as by their broad and general terms they enwrap the unsuspecting debtor in the folds of indebtedness embraced and secured in the mortgage which he did not contemplate, and to extend them further than has already been done would, in our opinion, be dangerous and unwise. . . ."

Where the construction of a mortgage is brought in issue the primary question for determination is what was the intention of the parties. In arriving at a decision of the matter, all the circumstances attending the execution of the mortgage and the nature of the transaction are to be considered as well as the language of the instrument itself. (*Hendrickson v. Farmers' Bk. & Trust Co.,* 189 Ark. 423, 433, 73 S. W. 2d 725.) In the *Hendrickson* case the court stated that where a mortgage has been given to secure a debt specifically named, the security will not be extended to cover debts subsequently incurred unless they be of the same class and so related to the primary debt secured that the assent of the mortgagor will be inferred. The reason is that mortgages, by the use of general terms, ought never to be so extended as to secure debts which the debtor did not contemplate. The court then proceeded to quote the following passage from *American Bank & Trust Co. v. First National Bank of Paris,* 184 Ark. 689, 43 S. W. 2d 248:

". . . 'Where one contracts in good faith with a debtor that the security given should include not only that specifically mentioned in the mortgage but other indebtedness, whether existing then or to be incurred in the future, it is not difficult to describe the nature and character thereof, so that both the debtor and third parties may be fully advised as to the extent of the mortgage.' " (pp. 433, 434.)

The foregoing cases were later followed by *National Bank of Eastern Arkansas v. Blankenship,* 177 F. Supp. 667, 673, where the court spoke in this wise:

"The 'other indebtedness' secured by a mortgage may be either antecedent or subsequent. Where it is antecedent, it must be identified in clear terms, and where it is subsequent, it must be of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred. (Citing cases.)"

To similar effect see *Belton v. Bank*, 186 N. C. 614, 616, 120 S. E. 220.

It occurs to us that a number of circumstances bear on the intention of the parties to the mortgage now before us. It was executed in 1963 to secure an indebtedness contemporarily incurred. The record shows no additional funds advanced to the Mounkes or further financial dealings had between them and the bank for more than eight years, when Mr. Mounkes "by his lonesome" signed a note for $5100. This latter note contains no reference of any sort to the real estate mortgage jointly executed eight years before. We believe the omission is significant, especially in view of the fact that a space was provided in the note for recording the description of collateral security. In the space thus provided there was typed, presumably by the bank, the word "Sig." The record reveals from statements made by plaintiff's counsel that this means "signature" and that "Normally, you think of a signature loan as being a loan on which there was no security whatsoever." Furthermore, the record bears no evidence of any relationship between the 1963 loan to Mr. and Mrs. Mounkes and the subsequent loan to Mr. Mounkes. There is not the slightest intimation that any part of the loan to Mr. Mounkes was to be used in the repair or improvement of the Mounkes residence—indeed, such a suggestion is negated by the statement that it was to help a son get into the restaurant business.

Our decision in *Stockyards National Bank v. Capitol Steel & Iron Co.*, supra, underlines the significance of referring, in subsequent notes, to a mortgage previously executed, if it is contemplated that the mortgage will provide security for the later notes. The defendants urge that the rationale of the *Stockyards* case is of controlling effect as to this point, and we are inclined to agree it is of precedential value.

Somewhat simplified, the facts of that case were these: Kansas Steel Corporation (Kansas Steel) executed two promissory notes to the Stockyards Bank and secured their payment by separate real estate mortgages each containing a dragnet clause. Subsequently, Kansas Steel executed a series of eight promissory notes to the bank containing no reference to the bank's mortgage but

showing them secured by warehouse receipts. After the eight notes had been given to the bank, Kansas Steel executed two promissory notes to Capitol Steel & Iron Co. (Capitol Steel) and secured them by a second mortgage on the same property mortgaged to the bank.

Hard times descended on Kansas Steel and its ship began to founder. The bank filed proceedings to foreclose its mortgages, joining Capitol Steel and other lien claimants as defendants. When the assets of Kansas Steel had been liquidated there were not enough funds to go around, and the bank came up shy on the warehouse receipts. The bank then contended it could resort to the proceeds from the mortgaged real estate, which were in excess of the balance due on the original notes, before Capitol Steel could be paid on its second mortgage. In rejecting the bank's position, this court said:

". . . [W]e find nothing in the language relied upon in the eight promissory notes which refers or relates in any way to the real estate or creates any lien upon it or makes it liable for any indebtedness created by virtue of the notes. The only collateral security referred to in these unrecorded notes, and sought to be bound is the personalty mentioned therein—the warehouse receipts. It is elemental that, absent agreement of the parties, a mortgage given to secure a particular debt cannot be enforced as security for another or different debt (59 C. J. S., Mortgages, § 178a)." (p. 432.)

An opinion we find persuasive hails from our sister state in the far reaches of the Pacific Ocean. In *Akamine & Sons v. Am. Sec. Bank*, 50 Haw. 304, 440 P. 2d 262, questions of priority arose between two creditors, it being contended on the part of one bank that its dragnet mortgage gave it priority as to property which had been mortgaged to a second bank at a later date. The Supreme Court of Hawaii did not look kindly on the contention thus advanced, nor did it view dragnet mortgages in general with unjaundiced eye. In the opinion it was said:

"We are prevented from holding a mortgage to secure future advances contrary to public policy by its statutory authorization and the undeniable benefits which it may engender. As a court of equity, however, we will construe such mortgages very strictly against the mortgagee. . . . Completely unrestricted enforcement of such mortgages would tend to reduce the borrower to the status of economic serf. . . .

"Under the ejusdem generis rule, the statute does not require us to enforce a dragnet, or anaconda, clause in a mortgage as to debts or obligations not of the same kind as the specific principal debt or obligation for which the mortgage is given. Unless the prior or subsequent advance relates to the same transaction or series of transactions, the mortgage must specifically refer to it

for the advance to be secured. This court will not assist a lending institution in an attempt to captivate a borrower by inclusion in a mortgage of a broad all inclusive dragnet clause. . . . To attempt to foreclose, for example, on the mortgagor's home for debts incurred in operating a business and which debts are not specifically covered by the mortgage would be unconscionable and contrary to public policy." (pp. 312, 313.)

We are aware that the trial court, in entering judgment *in rem* in favor of the bank, found it was the parties' intention at the time of the execution of the mortgage that it would secure payment of any sums of money which the mortgagee might loan the mortgagors or either of them. The difficulty with that conclusion is that the record contains no supporting evidence except for the dragnet clause itself. That clause we deem to be insufficient in the face of this record. As we have heretofore said, it is necessary, when determining the intention of the parties to a mortgage, that the attending circumstances and the nature of the transaction be considered. Here there is nothing from which it may be inferred that by mortgaging their homestead the defendants contemplated it would stand as security for a loan obtained by Mr. Mounkes to start his son in business eight years later. There is a total lack of evidence to sustain a presumption the two loans were related in any sense. The evidence is, indeed, quite to the contrary and we are constrained to hold the finding of the trial court is not sustained by the record.

In summary, we hold that in the absence of clear, supportive evidence of a contrary intention a mortgage containing a dragnet type clause will not be extended to cover future advances unless the advances are of the same kind and quality or relate to the same transaction or series of transactions as the principal obligation secured or unless the document evidencing the subsequent advance refers to the mortgage as providing security therefor. The loan extended to Mr. Mounkes in 1971 does not meet these criteria.

In view of the conclusion we have reached other points raised by the defendants need not be discussed except that we may note there is nothing in the record to sustain the defendants' claim for damages on their cross petition. Indeed, the defendants have not even briefed that area.

The judgment entered against the defendants for $1651.51 on the original note and decreeing foreclosure of the mortgage as to such amount is affirmed. The judgment *in rem* in the amount of $5911.53 is reversed. The judgment in plaintiff's favor on the defendants' cross petition is affirmed.

It is so ordered.