FIRST SECURITY BANK OF UTAH, a
National Association, Plaintiff and
Respondent,

v.

Bill SHIEW, Linda Shiew, and Utah Farm
Bureau Insurance Company, a Utah Cor-
poration, Defendants and Appellant.

No. 16261.

Supreme Court of Utah.

March 13, 1980.

G. Blaine Davis of Morgan, Scalley, Lunt
& Kimble, Salt Lake City, for Utah Farm.

Eric Swenson, Mexican Hat, for Shiew.

Don Allen, James W. Gilson of Ray, Quinney & Nebeker, Salt Lake City, for plaintiff and respondent.

MAUGHAN, Justice:

Utah Farm Bureau Insurance Company appeals from a judgment of the District Court awarding to First Security Bank of Utah the sum of $4,369.25, plus interest and costs, for the wrongful disbursement of fire insurance proceeds. The bank's claim is contingent on whether the insured premises were security by reason of a dragnet clause in a mortgage thereon for a subsequent, unrelated business transaction of the mortgagors. The judgment is reversed, and the cause is remanded with an order to enter judgment in favor of the insurance company.

In 1972, Bill and Linda Shiew purchased a home in Monticello, Utah. Plaintiff's branch in Monticello, Utah, loaned $6,342.48 to the Shiews; this loan was secured by a mortgage on the home. A standard printed provision in the mortgage recited it was "to secure the payment of any and all claims or demands now due or to become due now or hereafter contracted or incurred which the said mortgagee or the holder hereof, from time to time, may have or hold against the mortgagors or either of them, whether as maker, surety, guarantor, partner or otherwise, and whether contracted directly with or purchased by the holder hereof: . . ."

In 1974, in connection with a cattle-raising venture, the Shiews obtained a loan of $8,900.00 from plaintiff's branch in Price, Utah. The parties entered into a security agreement (Farm Products Chattel Mortgage) to secure this loan. The recited security was certain specified cattle and feed as well as all after acquired cattle and feed. The security agreement made no reference to the mortgage on the debtor's home as additional security. In fact, the security agreement recited: "This agreement constitutes the entire agreement between the parties."

In 1975, the Shiews were divorced, and Linda Shiew was awarded the home in Monticello. In April 1976, plaintiff filed an action against the Shiews in connection with the cattle business transaction. Plaintiff alleged that the security for payment of the note had *all* been disposed of in accordance with the terms of the security agreement, and the collateral was totally exhausted. Plaintiff claimed a deficiency of $4,369.25 and demanded judgment for that amount, plus interest and attorneys fees. It is significant that at the time of filing this action plaintiff did not claim the loan was further secured by a mortgage on the home in Monticello. Further, if the cattle loan were secured by the real estate mortgage as later claimed by plaintiff, under Section 78-37-1 (the single action rule), plaintiff would have been compelled to foreclose the real estate mortgage and exhaust that security rather than attempting to recover the debt directly by a money judgment.

Linda Shiew answered the complaint, but a judgment by default was entered against Bill Shiew on September 1, 1976. This judgment recited the facts concerning the loan transaction in 1974 in Price, Utah, and reiterated that the collateral securing the loan had been exhausted and a deficiency of $4,369.25 remained, and judgment against Bill Shiew was awarded in this amount to plaintiff.

Subsequently, on October 14, 1976, plaintiff filed a motion for leave to file an amended complaint and for an order making Utah Farm Bureau Insurance Company a defendant. This motion was granted.

The home in Monticello had been destroyed by fire in 1976. Plaintiff was a loss payee under the insurance policy. The insurance company issued a check payable to Linda Shiew and plaintiff in the sum of $10,000. The plaintiff requested Mrs. Shiew's endorsement so that it could satisfy the outstanding balance due on both the Price and Monticello loans. Mrs. Shiew refused to pay off the Price loan out of the fire insurance proceeds. Plaintiff notified the insurance company of this dispute.

On May 11, 1976, the insurance company issued two separate checks. One was payable to plaintiff in the amount of $2,843.80, the unpaid balance on the loan on the home in Monticello. The other check, payable to Linda Shiew, was in the amount of $7,156.20.

On November 10, 1976, plaintiff filed an amended complaint. In the first cause of action, plaintiff alleged the same facts and pleaded for a judgment against the Shiews, jointly and severally for the deficiency. In the second cause of action, plaintiff for the first time asserted that the dragnet provision in the mortgage on the home in Monticello made the mortgage security for any other indebtedness of Shiews. Plaintiff alleged that the insurance policy issued on the home contained a mortgage clause, and the house and its contents were destroyed by fire. Plaintiff alleged that the insurance company wrongfully paid the proceeds of the insurance to Linda Shiew, while Shiews were indebted to plaintiff in the sum of $4,369.25, together with interest and costs; plaintiff demanded judgment against the insurance company.

Upon trial before the court, plaintiff was awarded judgment against the insurance company and Linda Shiew. The insurance company alone appeals therefrom.

The primary issue submitted by defendant to the trial court and then to this Court concerns the proper interpretation of a dragnet clause in a mortgage. Defendant vigorously urged the dragnet clause should be interpreted according to the Kansas [1]—Hawaiian [2] rule, which provides:

". . . in the absence of clear, supportive evidence of a contrary intention a mortgage containing a dragnet type clause will not be extended to cover future advances unless the advances are of the same kind and quality or relate to the same transaction or series of transactions as the principal obligation secured or unless the document evidencing the subsequent advance refers to the mortgage as providing security therefor. . . ." [3]

This Court has not previously undertaken a definitive interpretation of dragnet clauses in mortgages.

In Osborne, Nelson, Whitman, Real Estate Finance Law (1979), Section 12.8, p. 772, a dragnet clause is described as a mortgage provision which purports to make the real estate security for other, usually unspecified debts which the mortgagor may already owe or may owe in the future to the mortgagee. The lender usually has no particular future advances in mind and merely includes the clause for its potential future utility. Frequently, as in this case, the clause is included in the printed language of mortgages drafted by the mortgagee. These clauses are seldom the subject of negotiation and may go entirely unnoticed by the mortgagor until the mortgagee asserts them.

Osborne explains: [4]

". . . Dragnet clauses are generally upheld, but because their apparent coverage is so broad, and because the mortgagor is often unaware of their presence or implications, the courts tend to construe them narrowly against the mortgagee. Generalizations are difficult, since the language of the particular clause may be a decisive factor. However, the following illustrations show numerous ways in which the courts have narrowed the application of dragnet clauses. Sometimes such holdings are said to be based on the intention of the parties, but in reality they usually represent the court's conceptions of fairness and equity. These illustrations are not intended to represent any majority rule, as there are many conflicting or contrary cases. They merely show the sort of judicial treatment dragnet clauses often receive.

"1. The mortgage will only secure advances made or debts incurred in the

1. *Emporia State Bank and Trust Company v. Mounkes*, 214 Kan. 178, 519 P.2d 618 (1974).

2. *Akamine & Sons, Ltd. v. American Security Bank*, 50 Hawaii 304, 440 P.2d 262 (1968).

3. Note 1 supra, at p. 623 of 519 P.2d.

4. Id., pp. 773–775.

future. If the mortgagor already owes debts to the mortgagee at the time the mortgage is executed, it would supposedly be easy to identify those existing debts specifically; if they are not so identified, it is assumed that the parties did not intend to secure them.

"2. Only debts of the same type or character as the original debt are secured by the mortgage. For example, if the original loan is for home repairs, a future loan or advance for more repairs would be secured by the mortgage but a loan for an automobile purchase would not. It is easy to imagine grey areas in such a test. For example, what if the second loan were for adding a room to the house? The resolution of the matter is made easier if the documents on the second loan state that it is to be secured under the dragnet clause of the existing mortgage.

"3. As an extension of the foregoing concept, it is sometimes held that the dragnet clause will cover future debts only if the documents evidencing those debts specifically refer back to the clause.

"4. If the future debt is separately secured, whether by another mortgage or by a personal property security agreement, it may be assumed that the parties did not intend that it also be secured by the dragnet mortgage.

"5. The clause is inapplicable to debts which were originally owed by the mortgagor to third parties, and which were assigned to or purchased by the mortgagee.

"6. If there are several joint mortgagors, only future debts on which all of the mortgagors are obligated (or at least of which all were aware) will be covered by the dragnet clause.

"7. Once the original debt has been fully discharged, the mortgage is extinguished and cannot secure future loans.

"8. If the real estate is transferred by the mortgagor to a third party, any debts which the original mortgagor incurs thereafter are not secured by the mortgage. . . ."

Osborne further admonishes:

"While the dragnet clause is usually regarded as advantageous to mortgagees, that is not necessarily the case. One reason is that the types of judicial limitations on the clause discussed above are very much open to debate and further development in most states; in this sense, the clause is an invitation to litigation. . . ." [5]

The foregoing illustrations indicate the diverse and numerous consequences which may flow from a dragnet clause. Although a clear majority rule has not evolved concerning the interpretation of these clauses, there is a consensus that dragnet clauses are not favored in equity and that they should be carefully scrutinized and strictly construed.[6] As the court observed in the *Akamine* case:[7] "Completely unrestricted enforcement of such mortgages would tend to reduce the borrower to the status of economic serf. . . ."

In the *Akamine* case the court ruled that unless the prior or subsequent advance related to the same transaction or series of transactions, the mortgage must specifically refer to it for the advance to be secured. The court explained it would not assist a lending institution in an attempt to captivate a borrower by inclusion in a mortgage of a broad all inclusive dragnet clause. The court observed contracts requiring one party to deal exclusively with one supplier have been viewed with great suspicion under the antitrust laws. The court stated:

". . . to attempt to foreclose, for example, on the mortgagor's home for debts incurred in operating a business and which debts are not specifically cov-

---

5. Id. p. 775.

6. *Freese Leasing v. Union Trust And Savings Bank*, Iowa, 253 N.W.2d 921 (1977); *Emporia State Bank and Trust Company v. Mounkes*,

note 1 supra; *Akamine & Sons, Ltd. v. American Security Bank*, note 2 supra.

7. Note 1 supra, at p. 267 of 440 P.2d.

ered by the mortgage would be unconscionable and contrary to public policy." [8]

In *Emporia State Bank and Trust Company v. Mounkes* [9] the court observed the primary question for determination, where the construction of a mortgage was in issue, was the intention of the parties. Such a decision is based on all the circumstances attending the execution of the mortgage and the nature of the transaction as well as the language of the instrument itself. The court explained where a mortgage has been given to secure a debt specifically named, the security will not be extended to cover debts subsequently incurred unless they be of the same class and so related to the primary debt secured that the assent of the mortgagor will be inferred. The court stated the rationale for such a rule was that mortgages, by the use of general terms, ought never to be so extended as to secure debts which the debtor did not contemplate. The court stated:

"We are aware that the trial court in entering judgment *in rem* in favor of the bank, found it was the parties' intention at the time of the execution of the mortgage that it would secure payment of any sums of money which the mortgagee might loan the mortgagors or either of them. The difficulty with that conclusion is that the record contains no supporting evidence except for the dragnet clause itself. That clause we deem to be insufficient in the face of this record. As we have heretofore said, it is necessary, when determining the intention of the parties to a mortgage, that the attending circumstances and the nature of the transaction be considered. Here there is nothing from which it may be inferred that by mortgaging their homestead the defendants contemplated it would stand as security for a loan obtained by Mr. Mounkes to start his son in business eight years later. There is a total lack of evidence to sustain a presumption the two loans were related in any sense. The evidence is, indeed, quite to the contrary and we are constrained to hold the finding of the trial court is not sustained by the record." [10]

The court used a different type of analysis of a dragnet clause in *Second National Bank of Warren v. Boyle.* [11] In a case where there is no obligation to make future advances, a mortgage, which purports to secure future advances, cannot do so until such advance has been made. Until such time, the provision merely represents an expression of the intention of the mortgagor and mortgagee that the mortgage shall operate as a security for the obligations of the mortgagor with respect to such advances, if and when such obligation arises. Thus, these provisions, at most, represent an offer by the mortgagor to provide the security of the mortgage for such advances if and when they are made. If the mortgagee accepts such an offer in making a subsequent advance, then the necessity of executing and recording a new mortgage to secure such advance may be avoided.

The court framed the issue as to whether the bank, by what it did and said before and at the time of the 1948 loan, expressed an intention that the loan was to operate as an acceptance of the 1946 offer by the mortgagor that the 1946 mortgage would secure indebtedness thereafter incurred by the mortgagor to the bank. The court stated:

". . . Unless the bank did express such intention, the action of the bank, in making the 1948 loan, would not represent the *manifestation of assent to the mortgagor's offer which would be essential to the existence of a contractual obligation* to secure the 1948 loan by the 1946 mortgage. [Citations]" [12] [Emphasis supplied]

8. at p. 268 of 440 P.2d.

9. Note 1 supra.

10. at p. 623 of 519 P.2d.

11. 155 Ohio St. 482, 99 N.E.2d 474, 477 (1951).

12. See *Bloom v. First Vermont Bank And Trust Company*, Vt., 340 A.2d 78 (1975); ". . . a prerequisite to the mortgagee's secured position under accrual clauses of this nature is a

A factor of significance in the *Boyle* case, which is applicable herein, was the observation by the Court concerning facts which it described as tending to negate any expressed intention on the part of the bank to accept the offer of the mortgagor. Specifically, the subsequent indebtedness was secured by a chattel mortgage, and the court observed the absence of any reference to other security tended to negate any suggestion the subsequent indebtedness was additionally secured by the dragnet clause, in the earlier real estate mortgage.

In *Union Bank v. Wendland*[13] the observation is made that the California courts have rather consistently tended to prefer a construction which was more faithful to the parties' actual expectations than to the literal wording of the dragnet clause. In the absence of an expressed intention of the parties, two tests have evolved by which the intention of the parties is to be ascertained. The first is the "relationship of the loans" test; under this standard, if there be little or no connection between the loans or the loans be so different in nature, an inference can be drawn that the parties did not intend the second loan to fall under the security of the first loan. The court described the second test as follows:

"Under the 'reliance on the security' test the inquiry is whether the second loan was made in reliance on the original security. Accordingly, when a different security is taken for the second loan an intent cannot be inferred that parties relied on the security for the first loan. The rationale here involved is that the dragnet clause in the first security instrument constitutes a continuing offer by the borrower to secure further loans under the security of the first security instrument and that when the lender accepts a different security he does not accept the offer. [Citations]"

■ In the instant case the dragnet clause was a standard boiler plate provision inserted by the mortgagee in the mortgage

on the Shiews' home in Monticello, Utah. There was no evidence this clause was a subject of negotiation between the parties, or that the attention of the mortgagors was directed to this provision. The mortgage was to secure a loan for the purchase of their home, and this transaction was with plaintiff's branch in Monticello, Utah, in 1972. In 1974, the Shiews entered into an entirely different type of transaction, a security agreement to finance a business venture, cattle raising. This transaction was conducted with a branch of plaintiff's bank in Price, Utah. The cattle and feed were recited as the security for this subsequent loan. Furthermore, the security agreement failed to mention the obligation was also secured by the real estate mortgage, and, in fact, refuted such a consequence by an integration clause which recited it constituted the entire agreement between the parties. The legal effect of this integration clause was the preclusion of any claim by the bank that it had accepted the mortgagors' continuing offer to secure future advances with the real estate mortgage on their home.

There is not a scintilla of evidence to support the inference the parties intended the second loan to be under the security of the first loan. The second loan was of an entirely different nature and type of transaction. The self-serving statements of the bank officer that he relied on the defendants' financial statement which specified their home as an asset is of no evidentiary value, for he did not claim he communicated an acceptance of the mortgagors' offer of the home as security, and, in fact, the integration clause of the security agreement would negate such an agreement.

■ In the instant case, when the dragnet clause is strictly construed against the mortgagee, who drafted it, and interpreted in accordance with afore-cited authority, there is an insufficient evidentiary basis to sustain the determination of the trial court that the mortgage on the Shiews' home constituted security for the subsequent se-

showing that the subsequent 'advance' was intended by the parties to be secured by the prior mortgage. . . . .

13. 54 Cal.App.3d 393, 126 Cal.Rptr. 549, 557 (1976).

curity agreement concerning the financing of their cattle venture.

WILKINS, J., concurs.

STEWART, J., concurs in result.

HALL, Justice (dissenting):

I respectfully dissent.

In adopting the holdings of certain other jurisdictions, the majority opinion fails to recognize that we have previously given a rather expansive meaning to open-end mortgage provisions for future advances. In *Bank of Ephraim v. Davis*,[1] this Court unanimously held that advances made pursuant to such a provision take priority over all subsequent lien holders. The mortgage is to be interpreted as any other contract and if the future advance provision is sufficiently certain, it will be upheld.[2]

The language of the clause held to secure future advances in *Bank of Ephraim* read as follows:

To secure payment of any and all extensions or renewals, and successive extensions or renewals, of the note above described, *or of the indebtedness* represented by the same, and of any other indebtedness represented by the same, and of any other indebtedness at any time arising from the mortgagor to the mortgagee, whether represented by notes, drafts, open accounts or otherwise,

. . . . .

In the instant case, the clause reads as follows:

. . . [T]his mortgage shall extend to and be security for . . . the payment of any and all claims or demands now due or to become due, now or hereafter contracted or incurred, which the said mortgagee . . . may have or hold against the mortgagors or either of them.

It is my opinion that the latter clause articulates with even greater clarity the meaning of the mortgage; hence it should be enforced according to its own terms. A party's subjective intent cannot alter the clear terms of a written contract[3] and the 1972 loan clearly provides that the mortgage was to be security for future advances.

The majority opinion suggests that the fact that the 1974 loan made no reference to the 1972 loan, in some way weakens the effect of the open-end, future advance clause. The question is not whether the 1974 livestock loan refers to the future advance clause, but rather whether the 1972 mortgage loan refers to the advance made in 1974. The trial court concluded that the future advance clause of the open-end mortgage loan clearly covered the 1974 livestock loan. The court's decision was based, at least in part, on the fact that the mortgaged property was listed as an asset by the Shiews during the negotiations for the Price loan. The manager of the Price branch of First Security testified as follows:

Q. Now, prior to the making of that loan, did you—well, you obtained from Bill Shiew, it's been admitted, a statement of his and Linda Shiew's assets, other than the cattle, is that right?

A. I did. He declared an $8,000 home in Monticello.

\*    \*    \*    \*    \*    \*

Q. What is the position of the bank with respect to the loan application that she took at the time?

MR. MORGAN: Objection, that calls for speculation and a legal argument as to what the position of the bank is.

THE COURT: He may answer that.

THE WITNESS: Because of the cattle situation, I had to look for other collateral, and I was aware of the open-end mortgage down in Monticello. And that's probably why it did not appear on the application, or the security document. It's very commonly used at First Security

---

1. Utah, 559 P.2d 539 (1977).

2. Id.

3. *Ephraim Theatre Company v. Hawk*, 7 Utah 2d 163, 321 P.2d 221 (1958).

Bank, and we've used it many times. I'm very much familiar with it.

\* \* \* \* \* \*

Q. When you negotiated the loan, Mr. Brown, with the Shiews, with respect to the cattle, and you took a financial statement from Mr. Shiew—did you not?

A. Yes, I did.

Q. Was the granting of the loan influenced by the financial statement that you got?

A. It was.

Q. To what extent?

A. Well, the cattle market, as we've stated before, had weakened, and the Shiews had 50 ton of hay that wouldn't have taken these cattle through the winter, and it was real close. We checked for that as additional collateral, and it stated there that the home was $8,000 worth in Monticello, and we had less than half of that, and that was very much an influence because they wanted to take it through the winter. I wanted to sell it then, but they thought 50 ton of hay, and they wanted to go through the winter hoping that the cattle price would strengthen. The didn't do that.

The majority also holds that the future advance provision should not apply to unrelated future indebtedness which was not anticipated at the time the mortgage was signed. I believe the court's reasoning in *First National Bank in Dallas v. Rozelle*[4] was sound wherein it was held that an agreement to secure future advances must necessarily intend to secure sums that are indefinite and uncertain at the time the mortgage was executed. Furthermore, based on the uncontroverted testimony quoted supra, the trial judge specifically found that the two loans were related in the instant case when he ruled as follows:

[T]he mortgaged property in San Juan County was set up by Bill Shiew as an asset when he applied for the livestock loan, and that said asset was relied upon by the plaintiff, and inducement to the plaintiff, in making the livestock loan.

. . .

In my opinion, the future advance of 1974 was therefore secured by the 1972 agreement. Furthermore, I believe Utah Farm should be held liable for First Security's loss, given the actual notice it had of the claim. The fire insurance policy, issued contemporaneously with the 1972 mortgage loan, named Bill Shiew as the insured and First Security as an additional insured, in its capacity as the mortgagee. The policy also contained the following provision:

Loss (if any) under this policy, on buildings only, shall be payable to the mortgagee(s) . . . under any present or future mortgage upon the property described in and covered by this policy, as interest may appear, and in order of precedence of said mortgages.

In the spring of 1976, (following the Shiew divorce) the Monticello house was destroyed by fire. On learning of the loss, Utah Farm issued a check for the face amount of the policy, to the order of Bill "Schew." Linda Shiew attempted to negotiate the check, but it proved unacceptable without her former husband's signature. Linda Shiew contacted Utah Farm who then issued a second check payable jointly to Linda Shiew and First Security. First Security contacted Linda Shiew and asked her to endorse the check so it could satisfy the outstanding balance due both on the Monticello ($2,843.80) as well as the Price loan ($4,369.25). Linda Shiew refused to endorse the check, claiming that she had no obligation to satisfy what she referred to as her former husband's business debts.[5] First Security contacted Utah Farm, giving notice of the dispute. Nevertheless, Utah Farm chose to issue two separate checks: one to First Security for $2,843.80 (the balance due on the 1972 Monticello loan) and the other to Linda Shiew for $7,156.20 (the

4. 493 F.2d 1196 (10th Cir. 1974). See also *Capocasa v. First National Bank of Stevens Point*, 36 Wis.2d 714, 154 N.W.2d 271 (1967).

5. In reality the obligation was incurred jointly by Linda and Bill Shiew.

face amount of the policy less the amount paid First Security).

Rather than performing its contractual obligation of paying the insurance proceeds to the insured (designated by the policy to be Bill Shiew and First Security), Utah Farm unilaterally decided to adjudicate the rights of the parties and issued two separate checks. Given its knowledge of the conflicting claims it should have been more circumspect. Having wrongfully paid insurance proceeds to Linda Shiew, Utah Farm was found to be jointly liable with the Shiews for the balance of the 1974 loan.

Such a decision is legally sound and is supported by the evidence.

I would affirm the trial court's ruling and judgment.

· CROCKETT, C. J., concurs in the dissent of HALL, J.