608 So.2d 1120 (1992)
MERCHANTS NATIONAL BANK
v.
Harry A. STEWART, Sr. and Betty Stewart.
No. 90-CA-0410.
Supreme Court of Mississippi.
April 1, 1992.
As Modified on Denial of Rehearing November 19, 1992.
*1121 Don A. McGraw, Jr., Montgomery Smith-Vaniz & McGraw, Canton, John C. Wheeless, Jr., Wheeless Beanland Shappley & Bailess, Vicksburg, for appellant.
Philip M. Nelson, Kirk & Nelson, Madison, for appellees.
En Banc.
BANKS, Justice, for the court:

I.
Merchants National Bank (MNB) appeals a judgment of the Chancery Court of Madison County adjudicating the rights of parties to foreclosure sale proceeds. The chancellor found that Harry and Betty Stewart (Stewarts) were entitled to the entire net proceeds. Aggrieved, MNB appeals to this court presenting several issues[1]. The dispute may be resolved, however, by answering three questions: (1) To which loans did the bank's security interest in the Stewarts' deed of trust apply; (2) What is the amount due the bank on those loans; and (3) What is the proper disposition of the sums remaining, if any? In the end, we hold that the chancellor committed manifest error in a number of respects, and we therefore reverse.

II.
The parties involved in the present action are not strangers to this Court, as they were here in 1988 on MNB's appeal of an adjudication of civil contempt for its failure to perform an agreed and court ordered *1122 settlement. See, Merchants National Bank, Vicksburg v. Stewart, 523 So.2d 961 (Miss. 1988). There, we affirmed the chancellor's judgment holding MNB in contempt for failing to comply with an agreed order directing it to foreclose on the Stewarts' deeds of trust.
The actions leading to this second appeal began with the mandate issued in Stewart I. There, we ordered MNB to foreclose on deeds of trust covering certain property in Madison County. The deeds of trust were executed by Harry Stewart, Jr. (Stewart, Jr.) and Eddie Ray Ellis (Ellis) in favor of the Stewarts to secure notes given by them to the Stewarts as part of the purchase price of the property. Each note was in the amount of $170,000.00. The Stewarts, by hypothecation agreement, assigned the Stewart, Jr. and Ellis notes and deeds of trust to MNB as security for certain of the latters' obligations to the bank.
C.E. Sorey, II (Sorey) and Phillip Nelson (Nelson), joint-substitute trustees conducted the foreclosure sale on July 15, 1988. MNB purchased the property for $610,000.00. Sorey and Nelson filed a "Complaint for Interpleader" on September 8, 1988, requesting that the Chancery Court of Madison County order the Stewarts and MNB to settle among themselves their rights and claims to the $610,000.00.
The Stewarts filed an "Answer and Claims of Harry A. Stewart and Betty Stewart to Complaint for Interpleader." They contended that all indebtedness due MNB by Ellis and Stewart, Jr. was fully paid and satisfied. This being so, the Stewarts reasoned that the collateral assignments were extinguished. They claimed that there was due and owing to them from Stewart, Jr. and Ellis $556,000.00, plus interest, reasonable attorneys' fees, and expenses incurred as a result of the default in the amount of $25,000.00. Thus, as their claims exceeded the $610,000.00 foreclosure proceeds, they claimed entitlement to the entire amount with interest.
MNB claimed that Stewart, Jr. and Ellis were indebted to it for a combined amount in excess of the proceeds of the sale; that the hypothecation agreement secured all indebtedness owed by the two; and that, as a result, it was entitled to all of the proceeds.
After a hearing on the interpleader action, the chancellor held that the Stewarts were entitled to the net proceeds from the foreclosure.[2]

III.
The Stewarts owned and farmed some 900 acres of land in Madison County, Mississippi. The operations met with success for a number of years and enjoyed credit supplied by MNB. As fate would have it, success turned to failure and after several bad crop years and mounting debt, the Stewarts were notified by the bank that it could no longer carry their debt. They and the bank mutually agreed that the farm should be sold. The Stewarts divided the farm in half and sold it to their son and son-in-law, Stewart, Jr. and Ellis, respectively.
As part of the transaction, the bank assisted Stewart, Jr. and Ellis in securing a ninety percent guaranteed Farmers Home Administration Loan for the purchase of the farm and farm equipment. At the time of agreement, there were three deeds of trust outstanding on the Stewart farm. The first deed of trust was to the Ross Estate for approximately $400,000, the balance of the original purchase price of the property to the Stewarts. The second mortgage was executed in favor of the Small Business Association (SBA) and had a balance of $108,000.00. MNB held the third deed of trust.
Before the FmHA loan could be approved, the Stewarts would have to pay the sum owed to the SBA or transfer the balance to other collateral. The Stewarts obtained *1123 substitution of collateral with the SBA and the loan was transferred and secured by their residence and three acres of land. As consideration for the Stewarts placing the loan against their residence, Stewart, Jr. and Ellis assumed the indebtedness owing to the SBA as part of the purchase price of the farm.
On May 23, 1983, the Stewarts sold the farm to Stewart, Jr. and Ellis, who each executed promissory notes in the amount of $170,000 in favor of the Stewarts, as the balance of the purchase price. Each note was secured by a first deed of trust and lien against each purchaser's half of the farm. Additionally, Stewart, Jr. and Ellis each borrowed the sum of $500,000 from MNB to pay the balance of the purchase price of the farm and farming equipment. This debt for each buyer, was evidenced by a note in the amount of $200,000 and one in the sum of $300,000. These notes were secured by a second deed of trust in favor of MNB. Also, pursuant to lender's agreements, the repayment of these notes totalling one million dollars was ninety percent guaranteed by the FmHA.
On this same date, Stewart, Jr. and Ellis each executed $170,000.00 unsecured promissory notes to the bank as security for crop production and equipment loans. The Stewarts agreed to guarantee, through the execution of Hypothecation Agreements, the repayment of this indebtedness to the bank. As collateral, they assigned to the bank their first deeds of trust from Stewart, Jr. and Ellis, each in the amount of $170,000.
After the 1983 crop season, all of the loans were in a state of default. MNB ultimately made a demand on Stewart, Jr., and Ellis for the payment of the loans. Because neither was able to accomplish payment, the bank began the process of foreclosing on the real property and repossessing the equipment.
The first attempt at foreclosure occurred in April 1984 and involved the first deeds of trust from Stewart, Jr., and Ellis to the Stewarts. In fact there were two attempts. The first was initiated by the Stewarts. The successful bidder at that sale was another of the Stewart sons, Larry Stewart. In the meantime, MNB substituted another trustee and instituted foreclosure. Litigation ensued wherein Larry sought to enjoin the bank's foreclosure. This dispute was settled between the parties and in an "Agreed Order of Dismissal," entered on July 27, 1984, the chancery court set-aside the foreclosure at which Larry purchased the land. The court also ordered that the Stewarts be given $34,200 upon the entry of the order as an advancement of their equitable interest in the first deeds of trust. MNB was also ordered to advance an additional $34,200 to the Stewarts on the day of the subsequent foreclosure sale provided for in the order. The Stewarts reserved the right to litigate over a remaining amount of equity of $152,000 in the deeds of trust. The court ordered MNB to foreclose on the deeds of trust executed by Stewart, Jr. and Ellis to the Stewarts and assigned by Stewarts to MNB. Stewart, Jr. and Ellis both filed bankruptcy petitions, which delayed foreclosure proceedings until 1985.
In the Spring of 1985, the bank commenced foreclosure but at that time foreclosed on the second deeds of trust on the property which secured the $200,000 and $300,000 loans which were also insured by the FmHA. The successful foreclosure bid by MNB was $780,000. The Stewarts received the second installment of the equity advance ordered by the court.
MNB in turn sold the property to Mike Hardy for $650,000. The bank also submitted a claim for guaranteed loss with FmHA which paid approximately $817,000 on all four loans to Ellis and Stewart, Jr.[3] Neither Stewart, Jr. nor Ellis received credit from MNB for payments made by FmHA because the bank contended that "payments from the FmHA did not reduce the liability of the borrowers in any way." The *1124 bank president, Howell Gage, explained that this is so because of the language in the Lender's Agreement between the FmHA and MNB which provides that "[a]fter a loan has been liquidated and a final loss has been paid by FmHA, any future funds which may be recovered by the lender, will be pro-rated between FmHA and the Lender. FmHA will be paid such amount recovered in proportion to the percentage it guaranteed for the loan and the lender will retain such amounts in proportion to the percentage of the unguaranteed portion of the loan."
After the 1985 foreclosure, the Stewarts filed a complaint indicating that MNB had not complied with the chancellor's order. It was that litigation which resulted in Stewart I. There, we affirmed an order of the chancery court holding MNB in contempt for failing to foreclose on the first deeds of trust owned by the Stewarts pursuant to the agreed court order. After remand, the Stewarts' deeds of trust were foreclosed and the fight over the $610,000 proceeds began.
The Stewarts contended that MNB should be considered to have received (1) the proceeds of the FmHA guaranty, (2) the first foreclosure sale, (3) the sale following foreclosure to Hardy  all to the credit of Ellis and Stewart, Jr.  and (4) extinguishing all debt owed to the bank by Ellis and Stewart, Jr. Thus, they argued that the proceeds were the property of the Stewarts by virtue of the fact that the total amount of Ellis' and Stewart Jr.'s indebtedness to them on the purchase money notes and the SBA loan assumption, together with interest and costs of collection, exceeded the amount of the proceeds.
MNB responded through the testimony of Gage, who stated that there were no proceeds from the original sale because MNB "set that foreclosure aside and those monies have never really been in the pot." He testified that, originally, after the sale in 1985, the bank made accounting entries on its books to make various credits for the sale, "but those accounting entries would have been reversed in '88, based on the voiding of that foreclosure sale." He contended, and appropriately so, that the $650,000 received from the sale of the property to Mike Hardy should not be included as part of monies received, in any event, because this was a separate transaction. He stated that it was his understanding that this Court required that the 1985 foreclosure be cancelled or voided. On July 14, 1988, Gage and Edley H. Jones, II, substitute trustee, executed an "[a]greement [v]oiding [f]oreclosure [s]ales and [t]rustee's [d]eeds." The bank filed the agreement and considered the foreclosure on the second deed of trust set-aside and voided. Gage stated that the bank then proceeded to foreclose on the first deeds of trust executed by Stewart, Jr. and Ellis for the benefit of Stewart, Sr.
The parties introduced several exhibits by stipulation. These included compilations which Gage testified were prepared under his supervision. These compilations reflected the bank's position at various times regarding the amounts owed by Ellis and Stewart, Jr. and a proper application of the proceeds of the foreclosure sale. He admitted that at one time, following the 1985 foreclosure, the bank's internal accounting records showed Ellis and Stewart, Jr. as having zero balances. He explained that this did not mean that Ellis and Stewart, Jr. did not owe the bank but merely reflected an accounting entry which may have been affected by the bank's view of collectability. In any event he contended that the 1985 entries had to be reversed because of the voiding of the 1985 foreclosure sale on which they were based.
The chancery court rendered its opinion on March 8, 1990, and held that Stewart, Sr. was entitled to all proceeds of the July 15, 1988, foreclosure sale. Less costs of sale, the Stewarts were awarded $603,000. The court credited the Ellis and Stewart, Jr. accounts with the proceeds from FmHA and from the first foreclosure. It is unclear whether it also credited those accounts with proceeds from the subsequent sale to Hardy. The chancellor concluded that MNB was estopped from denying the validity of the 1985 sale and further estopped from contradicting its internal accounting records as to the status of the *1125 Ellis and Stewart, Jr. accounts. Based on these holdings, the court concluded that MNB had no claim against the foreclosure proceeds here in question. The chancellor found that the Stewarts were entitled to the principal and interest on the purchase loans, the balance assumed on the SBA loan, plus attorneys' fees, all totaling in excess of the proceeds available from the 1988 foreclosure sale as indicated above.

IV.
The first task in disentangling what may be described as a fine mess is to focus on what exactly is at issue. MNB exercised right of sale on deeds of trust which were first in priority. See generally, Miss. Code Ann. § 89-1-55 (Supp. 1991); Wansley v. First Nat. Bank of Vicksburg, 566 So.2d 1218 (Miss. 1990) ("if the secured creditor is authorized to foreclose by power of sale, after the debtor's default and upon compliance with the deed of trust or other instrument, the secured creditor may sell any or all of the real estate that is subject to the security interest in its then condition... ." Id. at 1225.) The Stewarts owned these deeds of trust; MNB had but a security interest. Wansley, 566 So.2d at 1225. Nothing that MNB did with reference to liens inferior in priority had any effect on the issue except to the extent that MNB derived proceeds which should have been applied to debt owed to it for which it had a security interest. Reese v. Ivey, 324 So.2d 756, 757 (Miss. 1976). The deeds of trust are themselves representative of security interests held by the Stewarts in the farm land for payment of the purchase money owed to them by Ellis and Stewart, Jr. The Stewarts' interest in the proceeds then is limited to the amount owing to them for the purchase of the land and costs of foreclosure. Id.

A. What interest did MNB have in these deeds of trust?
The Stewarts executed a hypothecation agreement in favor of MNB to secure the crop and irrigation loans made to both Stewart, Jr. and Ellis each in the amount of $170,000. The security given by the Stewarts was an assignment of the deeds of trust owed to them by Stewart, Jr. and Ellis, each in the amount of $170,000.
The bank contends that these hypothecation agreements cover both the crop loans and purchase money notes secured by the second deeds of trust by virtue of the language contained within the agreement[4]. Stewart, Jr. and Ellis each executed a deed of trust in favor of Stewart, Sr. and Betty Stewart in the amount of $170,000 for the purchase of land on May 23, 1983. Subsequent to the signing of the first deeds of trust in favor of Stewart, Sr. and Betty Stewart, Stewart, Jr. and Ellis signed a second deed of trust in favor of MNB. This secured a note for the remaining purchase money which was also guaranteed by the FmHA. Stewart, Jr. and Ellis then signed notes for crop production and irrigation loans. Finally, Stewart, Sr. and Betty Stewart signed the hypothecation agreements, here in question, in favor of MNB to collateralize these crop and irrigation loans.
The question to be decided is whether the purchase money loans are within the scope of the hypothecation agreement signed by the Stewarts. The hypothecation agreement contains language which essentially acts as a dragnet clause. It is well settled within this jurisdiction that a dragnet clause is valid to encompass future debts that a borrower may incur, within the security agreement, Cochran v. Deposit Guaranty Nat'l Bank, 509 So.2d 1045 (Miss. 1987); Whiteway Finance Co., Inc., v. Green, 434 So.2d 1351 (Miss. 1983).
We have construed written instruments narrowly against the drafter when there is *1126 uncertainty or ambiguity as to the intent of the parties, Clark v. Carter, 351 So.2d 1333 (Miss. 1977); Stampley v. Gilbert, 332 So.2d 61 (Miss. 1976); Miss. State, etc. v. Dixie Contractors, 375 So.2d 1202 (Miss. 1979); accord, Baton Rouge Contracting, Co. v. West Hatchie Drainage Dist., 304 F. Supp. 580 (N.D.Miss. 1969), aff'd per curiam 436 F.2d 976 (5th Cir.1971); United States v. American National Bank, 255 F.2d 504 (5th Cir.1958).
The rationale for construing mortgages narrowly against the mortgagee is that the lender normally dictates the terms and conditions of its loans and the borrower has no choice other than accepting these terms and conditions. Id. at 507.
Other courts have recognized dragnet clauses as "boilerplate". Often these clauses are not discussed between the borrower and the lender so that the borrower is not aware of the existence or the effect of these clauses. United States v. American National Bank, 255 F.2d 504 (5th Cir.1958); Matter of Ladner, 50 B.R. 85 (Bkrtcy. 1985); First Sec. Bank v. Shiew, 609 P.2d 952, 957 (Utah 1980); Underwood v. Jarvis, 358 So.2d 731 (Ala. 1978); Mohler v. Buena Vista Bank & Trust Co., 42 Colo. App. 4, 588 P.2d 894 (1978).
It is from that perspective that we look to the language contained within the agreement to determine the intent of the parties at the time the agreement was drafted. If the document is clear and unambiguous as to the collateral securing other debts we have found intent to secure these debts. Newton County Bank, Louin Branch Office v. Jones, 299 So.2d 215, 218 (Miss. 1974); see also, Trapp v. Tidwell, 418 So.2d 786 (Miss. 1982) ("There is no question that dragnet clauses are enforceable if properly executed and stated in clear and unambiguous language." Id. at 792).
The nature of the secured debt has also been examined in determining the validity of dragnet clauses with respect to other debt. Some courts have held that unless the debt is of the same nature, or type as the secured debt, the language will not cover the other debt. Mark Twain Kansas City Bank v. Cates, 248 Kan. 700, 810 P.2d 1154 (1991); First Sec. Bank v. Shiew, 609 P.2d 952, 957-58 (Utah 1980). Moreover, the language "any and all other debts" that appears within the hypothecation agreement in dispute has been interpreted to include only debts similar to the primary debt secured by the document. Wong v. Beneficial Sav. and Loan Ass'n, 56 Cal. App.3d 286, 128 Cal. Rptr. 338, 342 (1976).
Courts have also held that antecedent debts will not be deemed within a dragnet clause unless they are specifically identified in the instrument. The rationale for excluding antecedent loans is that they are known to the lender at the time the agreement is drafted and should be included, if there is an intent to do so, since those loans are easily identifiable. Lundgren v. National Bank of Alaska, 742 P.2d 227, 235 (Alaska 1987); First Nat'l Bank & Trust Co. v. Lygrisse, 231 Kan. 595, 647 P.2d 1268, 1272 (1982); Underwood v. Jarvis, 358 So.2d 731, 735 (Ala. 1978). Only if these antecedent loans are included specifically, will the collateral be deemed to cover them. Kamaole Resort Twenty-One v. Ficke Hawaiian Investments, 60 Hawaii 413, 591 P.2d 104, 112 (1979); Lygrisse, 647 P.2d at 1273.
Applying these principles, we hold that as a matter of law on the undisputed facts, the hypothecation agreement does not encompass the second mortgages. The language used by MNB in these agreements is "boilerplate" in nature as the agreement was a standard form used by the bank. The bank contends that the Stewarts were fully aware that Stewart, Jr. and Ellis had signed second mortgages before the hypothecation agreements were signed. This fact is undisputed, because all of the agreements were signed on the same day. The bank was aware also of the obligations and, as the drafter of the document, could have easily and explicitly included them within the hypothecation agreements.
The primary debt secured by the hypothecation agreement was a line of credit to be used for crop production and irrigation. The notes the bank seeks to have included within the scope of the hypothecation agreement were for money to purchase *1127 land and were secured by that land, FmHA guarantees, and second liens. The chief obligation covered by the hypothecation agreement is different in nature. Moreover, the fact that these notes were otherwise fully secured, further indicates that they were not intended to be included under the hypothecation agreements. Shiew, 609 P.2d at 957.

B. What is the amount remaining due on the crop and irrigation loans?
Having determined what debt was secured by the hypothecation agreements, the next question presented for disposition is what is the amount due the bank on these loans. There is no serious dispute that, but for the question what, if any, effect is to be given the FmHA payment, the first foreclosure proceeds and the proceeds of other executions, Stewart, Jr. owed $172,800.49 and Ellis, $268,544.42 on the production loans/lines of credit as of August 28, 1989. These total $441,344.91.

1.
A question to be resolved, then, is how much, if any, should this be reduced by any proceeds received by the bank from other executions in excess of other debt owed by Ellis and Stewart, Jr. It is fairly clear that before any foreclosure, Ellis and Stewart, Jr. owed the bank a combined $1 million, plus interest on the purchase money loans. Interest ran at thirteen percent and more than $260,000 had accumulated. The expense of foreclosure was also to be considered. Proceeds from the first foreclosure sale were $780,000. The bank also received $817,000 from FmHA. It is readily apparent that if Ellis and Stewart, Jr. receive credit for both of these amounts, some amount is left over for application to the crop loans. It is equally apparent that if either the foreclosure proceeds or the guaranty payment is not considered in reducing the amount owed by Ellis and Stewart, Jr., no credits against the crop and irrigation loans are due. Although the bank received other proceeds from equipment sales it is not necessary, then, that we involve those sums in our computation because of our determination with respect to the issue involving these two larger sums.[5]
We give short shrift to the Stewarts' argument that the bank should be charged with having received both the $780,000 that it paid itself at the foreclosure sale and the $650,000 that it later "received" from the resale of the property to Hardy. It is elementary that the proceeds of the foreclosure sale determine the rights between grantor and beneficiary of a deed of trust absent fraud, bad faith or other defect. See, Lake Hillsdale Estates, Inc. v. Galloway, 473 So.2d 461 (Miss. 1985). In any event, no grantor is entitled to the benefit of the proceeds of both the foreclosure sale and a subsequent sale.
The right of Ellis and Stewart, Jr. to receive credit for the proceeds of the foreclosure on the second deeds of trust would be unquestioned but for the supposed reversal of the sale. A foreclosure did in fact take place. As it was a foreclosure on a second deed of trust, the first deed of trust was undisturbed and the purchaser at the foreclosure sale bought subject to the lien of the first deed of trust. MNB cites no authority which would support its unilateral action purporting to void this foreclosure sale. Nothing we said in Stewart I compelled its action. It must be deemed to have received $780,000 from Ellis and Stewart, Jr. toward their total debt.
This is not to say that MNB was estopped from questioning the validity of that sale. Judicial estoppel applies only in those cases where the party against whom the estoppel is sought has knowingly asserted a position which was inconsistent with its position in prior judicial proceedings. O'Neill v. O'Neill, 551 So.2d 228, 232 (Miss. 1989). Although MNB asserted the validity of the 1985 sale in Stewart I, *1128 based on what had transpired to that point, its present position is that the sale was rendered invalid by the opinion and mandate of this Court. That assertion is erroneous, but MNB is not estopped from making it. The chancellor, then, was right in crediting Ellis and Stewart, Jr. for the proceeds of the 1985 foreclosure sale, but for the wrong reason.

2.
The FmHA guaranty is another matter. MNB received $817,000 from FmHA pursuant to an agreement between MNB and FmHA which provides that no guaranty payments shall extinguish the debt between the MNB and the borrowers and that FmHA is entitled to receive ninety percent of any proceeds subsequently recovered. This agreement, if applied, would seem to dictate that MNB is liable to FmHA for ninety percent of the $780,000. Although an MNB officer was questioned on the issue whether FmHA and MNB had reached a settlement agreement regarding this repayment provision, there was no evidence, documentary or testimonial that such a settlement was reached. The officer testified that if he had indicated otherwise in earlier testimony, he misspoke. No earlier testimony was introduced. We are left with the officer's flat denial that there is such an agreement.
We have held that payment by a guarantor of another's indebtedness does not extinguish the obligation of the debtor to pay according to his agreement. Atkinson v. National Bank of Commerce, 530 So.2d 163, 165 (Miss. 1988).
Whatever may be the relationship in rights of the payee and guarantor, the fundamental scheme of the transaction remains, and that scheme is that the primary obligors, are obligated to pay the full measure of the indebtedness provided in their contract.
Id.
There we applied the common law to the issue of the creditor's standing as a real party in interest after payment. Id. Here it is apparent from the plain language of the contract between the parties that the proceeds of the FmHA guarantee do not extinguish the debt between MNB and the borrowers. Those proceeds, therefore, may not be counted in determining whether Ellis and Stewart, Jr. were entitled to a credit which may be applied to the crop loans.
Once the FmHA guarantee proceeds are removed from consideration, it is clear that MNB has not received sufficient proceeds from executions to extinguish the debts owed to it by Ellis and Stewart, Jr. on the purchase money and equipment loans.

3.
There remains a question, however, whether MNB is entitled to the full amount of the outstanding balance of the crop loans from the proceeds of the foreclosure sale in question. The Stewarts contend that MNB is not entitled to receive any costs of litigation or interest occasioned by its failure to foreclose upon the deeds of trust promptly as ordered by the court. This contention has merit.
Ordinarily, absent a contract or bad faith, a mortgagee is not compelled to foreclose upon collateral at any particular time, or at all. See, Seppala & Aho Const., Inc. v. Petersen, 373 Mass. 316, 367 N.E.2d 613 (1977). Here we have a different situation. The Stewarts are the beneficiaries of the deeds of trust in question. Ordinarily, they would have a right to foreclose to protect their interest. It was just this right that was at issue in the litigation which resulted in the agreed order. That agreed order contemplated an immediate foreclosure to protect the interests of both the Stewarts and MNB. It is that agreed order which distinguishes this case. Had the bank foreclosed on these deeds of trust, as ordered, its interest in the proceeds would have been fixed in the amount of the principal and interest outstanding at that time. That amount may be readily calculated from documents in evidence at an aggregate of $302,985.81.

*1129 C. What remains for the Stewarts and to how much are they entitled?

MNB is entitled to $294,527.31 of the proceeds in order to extinguish the crop loan debts. It is also clear that MNB has advanced the Stewarts $68,400 against their equity in the deeds of trust. It is entitled to reimbursement for this amount. Thus it is entitled to $362,927.31 of the proceeds. This leaves approximately $240,000.[6]
MNB questions whether the Stewarts are entitled to recover the SBA loan assumption and attorneys' fees from the proceeds. These matters are of moment to the bank, because after the Stewarts' debt is satisfied, the remainder would belong to Ellis and Stewart, Jr. who, in turn, remain indebted to bank. Fortunately, for the sake of simplicity, the Stewarts' principal and interest claims alone far exceed the remaining balance of the proceeds. We therefore need not, and do not, reach these issues. We conclude that MNB is entitled to $362,927.31 and that the Stewarts are entitled to the balance of the net proceeds. Additionally, the interest which has accrued on the proceeds should be divided between the Stewarts and MNB, pro rata.

CONCLUSION
The order of the chancellor is reversed and this case is remanded to the Chancery Court of Madison County for disposition in conformity with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN and PITTMAN, JJ., concur.
McRAE, J., dissents.
NOTES
[1] MNB assigned the following as error: Did the chancellor err in

1. finding that Merchants National Bank was estopped to deny the truth of accuracy of its accounting ledgers?
2. finding that Merchants National Bank was estopped to assert the invalidity of the April 8, 1985, foreclosure sale?
3. crediting to the underlying indebtedness the guaranty payments of the Farmers Home Administration?
4. determining that no indebtedness was due Merchants National Bank and that the hypothecation agreement signed by Harry Stewart, Sr. and Betty Stewart was moot?
5. determining the amount owed to Harry Stewart, Sr., et ux. under the first mortgages included $108,229.48, for an SBA loan?
6. determining that the amount owed to Harry Stewart, Sr., et ux. under the first mortgage included attorneys' fees?
7. failing to determine the correct amount owed Merchants National Bank under the crop production loans of Harry Stewart, Jr., et ux. and Eddie Ray Ellis, et ux.?
8. awarding the Stewarts' judgment for the full amount of the interplead funds, less costs of sale?
In their brief, the Stewarts argued that the chancellor committed no error and the opinion should be affirmed in all respects.
[2] At trial it was stipulated that the Stewarts claimed from Ellis and Stewart, Jr. each, $170,000 in principal, $80,750 in interest, $54,114.74 as a one-half share of an SBA loan assumed by them and $13,000 in attorneys' fees. The parties also stipulated that the $68,400 previously paid by the bank would have to be deducted. The chancellor made no reference to this latter stipulation in his opinion.
[3] The FmHA paid $285,499.36, ($142,749.68 each) on the two $200,000 equipment loans and $541,961.86 ($270,980.93 each) on the two $300,000 loans for the land. The record does not reflect how the amount was derived. It is apparently ninety percent of the outstanding balance after credit for proceeds for sale of the equipment.
[4] "and I hereby grant to you, a security interest in said property to secure payment of such loan or loans, including but not limited to loans made under said line of credit, and all renewals and extensions thereof without limitation, including any loans that may be over said line of credit, and also for any and all other indebtedness of Borrower to you, created at any time before you shall have received written notice from me terminating this Hypothecation Agreement and all renewals and extensions thereof." (emphasis supplied)
[5] Documents indicate that the bank received $55,162.34 on the Ellis equipment auction and $68,918.37 from the Stewart, Jr. equipment auction. It also received $48,008.35 from the foreclosure on Stewart, Jr.'s house.
[6] Although it is true that MNB was given a security interest in Stewart's interest and Stewarts' security interest was initially limited to $340,000, plus interest. Stewarts' security interest grew by virtue of the dragnet clause in the deeds of trust. Stewarts' guarantee of those loans were not otherwise secured and they meet the prerequisites for application of that claim as discussed in Part IV A. infra.