375 So.2d 1202 (1979)
MISSISSIPPI STATE HIGHWAY COMMISSION
v.
DIXIE CONTRACTORS, INC.
No. 51465.
Supreme Court of Mississippi.
October 10, 1979.
*1203 A.F. Summer, Atty. Gen. by Frank E. Shanahan, Jr., Asst. Atty. Gen., Shell, Buford, Bufkin, Callicutt & Perry, K. Hayes Callicutt, Jackson, for appellant.
Cox & Dunn, Vardaman S. Dunn, Jackson, for appellee.
Before PATTERSON, SUGG and WALKER, JJ.
PATTERSON, Chief Justice, for the Court:
Dixie Contractors, Inc. brought suit in the Chancery Court of the First Judicial District of Hinds County for additional compensation allegedly owing by the highway commission on a contract known as Federal Aid Project # I-10-1(15)16. The case went to trial at the April 1976 term of court, and on December 29, 1978, the chancellor rendered judgment against the highway commission in the sum of $359,763.96, plus interest at the rate of 8% from the date of the final decree until payment. This appeal by the highway commission followed.
The issue raised by the complaint concerned the proper measurement for hauling materials in performing the contract. Dixie's bid fixed unit prices for various materials, a specified dollar amount being offered per cubic yard. Dixie's case requires interpretation of the contract to determine the aggregate number of cubic units which had been hauled in a manner entitling it to additional payment under the contract.
Blueprints illustrating engineering cross-sections of segments of the construction of this interstate highway in Hancock and Harrison Counties beginning at the Jordan River were introduced into evidence. The project begins in a low-lying, sandy area, and progresses into more hilly terrain. Construction of the four-lane highway required both cutting into the hills ("cut sections") and filling up the depressed areas ("fill-sections") to create parallel lanes for travel. The first 0.9 miles of the project, referred to as B.O.P. ("Beginning of Project") to Station 870 + 00, is depicted in Plan Sheet 2-D, the blueprint designated as Exhibit D-1. The remaining 11.4-mile segment of the project, referred to as Station 870 + 00 to E.O.P. ("End of Project"), is depicted in Plan Sheet 2-E, the blueprint designated as General Exhibit 5.
As can be seen from the plans, various types of material encountered in the excavation required for building the highway received different classifications (e.g. "muck," "plating material"). Each classification carries with it a "pay item" in the contract. The "pay item" states the amount to be paid per cubic yard for the classification in question. Excavation of certain classes of materials pays more than other classes: Unclassified excavation (F.M.) pays only 62¢ per cubic yard; whereas unclassified excavation (plating material) *1204 (F.P.M.) pays $1.45 per cubic yard under Dixie's bid. Thus classification of materials bears directly upon the measure of payment under the terms of the contract.
The highway commission drafted the entire contract in question and invited unit bids on it. The contract includes a number of documents  proposals, specifications, plans (blueprints), etc.  all of which were admitted into evidence by stipulation. The basic handbook and guide to the construction under the contract appears as Exhibit 3 in the record, a technical book entitled "Mississippi Standard Specifications for Road & Bridge Construction" (1956 Ed.). Section 5.04 of the specifications defines the constituents of the contract between the commission and any contractor doing road work under a bid. It states:
The specifications, the plans, special provisions, and all supplementary documents are essential parts of the contract, and a requirement occurring in one is as binding as though occurring in all. They are intended to be complementary, to describe and provide for complete work... . Plans, generally, shall govern over specifications, and special provisions shall govern over both plans and specifications. (emphasis supplied).
A vital aspect of the present dispute concerns the existence in the contract between Dixie and the highway commission of a special provision, which, under the language quoted above, would "control" over all other parts of the contract, including the plans (blueprints). This Special Provision, No. 1642, must be read along with blueprint 2-E, focusing upon three block paragraphs of draftsmen's notes appearing beneath and to the right of the words "ONE-HALF FILL SECTION." These notes refer to "variable depth unclassified excavation (stripping top soil or unstable material) to be removed (pay item 23-a)" and go on to indicate that this type of excavation "shall be stockpiled for plating slopes." "Plating" describes material that is spread in a layer on the embankment of the "cut section" as depicted in the drawing on the lower left side of plan 2-E.
Article 401-23.07 in Special Provision 1642 defines "unclassified excavation (plating material)" as any material designated on the plans by the engineer as "stripping or unstable material" other than "muck." Dixie contends the term therefore includes all material stripped from beneath the load-bearing area of fill sections throughout the project to the extent that material had been removed by Dixie, stockpiled, and later hauled a second time for construction of fill section embankments beyond the 2:1 slope. In support, Dixie contends that the plans use the apparently mandatory phrasing "to be removed." Dixie concedes the purpose of removal, at least in part, is to stockpile top soil for plating purposes, but it argues that the draftsmen's notes clearly contemplate more material than needed for plating will be stockpiled; because these notes refer parenthetically to "the excess of the amount needed for plating slopes," and state that excess "shall be used in the construction of fill beyond the 2:1 slope as shown." Dixie concludes that the second "haul" of the stripping material from stockpile to embankment must therefore be separately compensated under pay item 401-23-P at the rate of $1.45 per cubic yard. This claimed compensation would be in addition to the 62¢ per cubic yard which Dixie has already received under the highway commission's calculation based upon a single continuous move of the stripping material beneath the fill sections to the embankment construction on those sections, without the intervention of a stockpile and a second "haul."
The highway commission argues that only enough stripping material necessary to plate the slopes as indicated on the plans should have been permitted under pay item 401-23-P, and that any excess stockpiled along the 11.4-mile segment of the project and eventually used for embankment construction ("fill") beyond the 2:1 slope on fill sections should not have been allowed, as it was by the chancellor. In support, the commission stresses that the engineer did not authorize any stockpiling between the 2:1 *1205 slope and the edge of the construction limits.
Bids for the project were based upon unit (cubic yard) prices for different material classifications. The item in dispute, unclassified excavation (plating material) F.P.M. (Item 401-23-P) is listed on the proposal sheets at an estimated 45,705 cubic yards. Dixie does not seek to change the unit bid price, but rather the quantity of units measured in final position after completion of excavation. The parties agree, as they must in view of the third paragraph of section 2.01 of the specifications, that the quantity of units stated in the bid may vary, up or down, because they represent estimates only.
A "change order" issued by the highway commission hiked the quantity estimate from 45,705 cubic yards (the preliminary total listed in the proposals) to 75,705 cubic yards, and the commission's "final total" proved to be 92,711 cubic yards, almost 200% of the quantity estimates listed in the proposals. However, the commission argues that Dixie's calculation of the same pay item totaled 323,582.7 cubic yards, an approximate 800% increase in the quantity listed in the proposals on the same pay item, or an approximate 400% increase over the commission's "final total." The parties introduced conflicting evidence as to whether variations of this magnitude may be expected in the highway construction trade. Dixie notes that when its recovery under the decree of the chancellor is added to the total contract price, the variation from the original total bid based upon the commission's estimated quantities falls within a 10% range which the project engineer testified to be normal.
The highway commission argues Dixie assumes inconsistent positions, accepting measurement under the 0.9-mile segment of the project, but rejecting the measurement under the 11.4-mile segment. It complains that the trial court sustained Dixie's repeated objections to testimony concerning measurement on the 0.9-mile segment. It complains also that the chancellor sustained objections to testimony touching upon the commission's interpretation of the contract. We are of the opinion that much of the interpretative testimony which the highway commission tried unsuccessfully to introduce should have been admitted under the exception to the parol evidence rule which permits clarification of contract ambiguities by testimony showing agreed meanings between the parties or those common to the trade generally. Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652 (Miss. 1975).
The testimony was relevant. Relevancy requires only that the proffered evidence appear calculated to alter the probabilities of some fact of consequence in the suit. Performance under the entire contract, including the 0.9-mile segment, alters material probabilities with respect to construction of the contract as a whole; because all contract provisions should be harmonized if possible. See Yazoo & M.V.R. Co. v. First National Bank of Vicksburg, 119 Miss. 59, 80 So. 382 (1919). A course of performance under the first segment, depicted in plan sheet 2-E, could be a material aid in construing the performance to be required under identical pay items on the 11.4-mile segment depicted in the plan sheet. Moreover, any competent evidence of trade usage should have been admitted to clarify, hopefully, the complex and somewhat ambiguous language used by the commission in the technical documents constituting the contract at issue. Cf. Miss. Code Ann. §§ 75-1-205; 75-2-202(A) (1972).
Dixie correctly states an abstract rule of law requiring that ambiguities in a written contract be resolved unfavorably to the party who drafted the contract. See Globe Music Corp. v. Johnson, 226 Miss. 329, 84 So.2d 509 (1956). However, this rule may not be enlarged, as it seems to have been done, to exclude the drafting party's evidence aimed at clearing the ambiguity *1206 by showing reasonable commercial understandings, concerning the meanings of technical terms, arising from usage of trade or a course of performance. We note also that the manifest error rule has little, if any, application in cases such as this resting upon construction of documentary evidence. S. &. A. Realty Co. v. Hilburn, 249 So.2d 379 (Miss. 1971).
In our opinion, the testimony was erroneously excluded because it appears to have been relevant to the construction of the contract. We reverse and remand for a full trial.
REVERSED AND REMANDED.
SMITH, and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.