SUGG, Justice.
This is the second appeal[1] of this case and involves a claim of Dixie Contractors, Inc. against the Mississippi State Highway Commission for highway construction performed by Dixie under a contract with the Commission on a federal aid project.
At the conclusion of the first trial in the Chancery Court of the First Judicial District of Hinds County, the chancellor awarded Dixie a judgment against the Commission for the sum of $359,763.96. The award consisted of two items. (1) $334,763.96 which the chancellor found to be due Dixie for work performed under Pay Item No. 401-23-P. (2) $25,000 which represented the amount of retainage under the contract. In its answer the Commission admitted it owed Dixie the $25,000 retain-age and alleged it had offered, and was willing to pay, the $25,000 to Dixie if Dixie would give the Commission a release evidencing a final payment on the contract.
On the first appeal, the case was reversed and remanded for a new trial because the chancellor had erroneously excluded evidence. At the second trial, the record of the first trial, including all exhibits, was introduced in evidence, and both parties presented additional evidence. The chancellor rendered a final decree awarding judgment in favor of Dixie against the Commission in the amount of $359,763.96.
The contract is a unit price contract. Bidders were furnished with the contract documents which included plans, specifications, special provisions, and proposal sheets. The proposal sheets covered numerous items called pay items, and most pay *812 items were bid on the basis of a specified amount for each unit. Each pay item carried an estimated quantity which the bidders converted to a dollar amount by multiplying the unit price bid by the number of estimated units shown on the proposal sheet. The extensions of the items were then added and the result was the total bid on the entire project. The bidder submitting the lowest total bid is the low bidder and is ordinarily awarded the contract regardless of variations on the individual items making up the total. Dixie was the low bidder on the project with a bid of $4,577,488.45 and was awarded the contract. Dixie and the Commission executed a contract on May 13, 1968 which contained the following provision:
It is understood and agreed that the advertising according to law, the notice to creditors, the instructions to bidders, the proposal for the contract, the specifications, the revisions of the specifications, the special, provisions, and also the plans for the work herein contemplated, said plans showing more particularly the details of the work to be done, shall be held to be, and are hereby made a part of this contract by specific reference thereto and with like effect as if each and all of said instruments had been set out fully herein in words and figures.
The first page of the proposal and the contract documents furnished each bidder contains the following provision:
Current (1956) Edition of the Standard Specifications for Road and Bridge Construction adopted by the Mississippi State Highway Department and Approved by the Commissioner of the U.S. Bureau of Public Roads is made a part hereof fully and completely as if attached hereto, except where superseded by the Special Provisions, or amended by Revisions of the Specifications contained herein.
This case involves the amount due Dixie under Pay Item 401-23-P which covered unclassified excavation (plating material) (F.P.M.).[2] The Commission contended Dixie was entitled to be paid for 92,711 cubic yards of unclassified excavation (plating material), but the chancellor held Dixie was entitled to be paid for an additional 230,-871.7 cubic yards of unclassified excavation (plating material) at the bid price of $1.45 per cubic yard.
We are of the opinion that the contract and contract documents support the position of the Commission, and the chancellor erred when he allowed Dixie additional compensation under Pay Item 401 — 23—P. We are not reversing the chancellor on a finding of fact but are reversing on his construction of the contract. The manifest error rule has no application. We stated in the first opinion:
We note also that the manifest error rule has little, if any, application in cases such as this resting upon construction of documentary evidence. S. & A. Realty Co. v. Hilburn, 249 So.2d 379 (Miss. 1971). (375 So.2d at 1206)
The contract covered the construction of 12.285 miles of Interstate Highway No. 10 in Hancock and Harrison Counties. The construction began at the Jordan River in Hancock County and ended at the Wolf River in Harrison County.
The first .9 mile section of the project, beginning of project (BOP) to Station 870, was a continuous embankment. The remaining 11.4 miles section of the project was from Station 870 to the end of the project (EOP) and was through rolling hills which had either cut sections or fill sections.
From BOP to Station 870 the plans required the top soil, the unstable material, and muck to be stripped from the entire portion of the construction limits. The muck was to be removed and disposed of by the contractor. The top soil and unstable material were to be removed and stockpiled beyond the outer limits of construction for plating the slopes. The embankment, except for 12 inches of plating material on the outer slopes of the embankment and on *813 slopes in the median, was to be constructed from material furnished by Dixie and obtained by it from sources outside of the highway right-of-way.
In performing its contract on the .9 mile section from BOP to Station 870, Dixie stripped the plating material and muck between the outer limits of construction, stockpiled the plating material, and disposed of the muck. Dixie was paid for excavating the plating material under Pay Item 23A at the rate of 62$ per cubic yard and was paid for hauling the plating material to the stockpile under Pay Item 32A. Dixie was also paid for excavating and disposing of the muck under Pay Item 401-23-F at the rate of 97$ per cubic yard. Dixie then furnished and put in place the embankment material and was paid for this item under Pay Item 401-36 at the rate of $1.30 per cubic yard. After completing the embankment, Dixie then removed the plating material from the stockpile, placed it on the slopes and was paid for this work under Pay Item 401-23-P at the rate of $1.45 per cubic yard measured in its final position.
There was no disagreement between Dixie and the Commission for the work performed and the pay for such work on the .9 mile section. However, there is disagreement between Dixie and the Commission for the amount of plating material for which Dixie should be paid in that portion of the project from section 870 to the end of the project referred to in the testimony as the 11.4 mile section of the project.
Dixie contends it is entitled to be paid for plating material under Pay Item 401-23-P for all unclassified excavation material suitable for plating which was excavated from the cut sections and from under the core embankment. The Commission contends that Dixie is entitled to be paid only for the plating material placed on the back slopes, foreslopes and in the median area in the cut sections.
General Exhibit 5, introduced at the first trial and reintroduced at the second trial, is a typical section depicting a xh cut section and a xh fill section in the 11.4 miles portion of the project. This exhibit shows that the embankment under the traveled portion of the completed highway was to be constructed on a 2:1 slope. This part of the embankment is referred to in the testimony as the core embankment or the load bearing embankment. Outside the core embankment, additional fill was required to complete the embankment with the slope varying in accordance with the height of the fill as shown on the exhibit and set forth below.
Slope Height
6:1 0' - 7'
4:1 7' - 17'
3:1 Over 17'
The plans called for stripping top soil or unstable material to a variable depth under the core section of the embankment. Under the drawing of the xk fill section, the following notation appears:
Variable depth unclassified excavation (stripping topsoil or unstable material) to be removed. (Pay Item 23-A)
A sufficient amount of topsoil shall be stockpiled for plating slopes at station limits indicated at left. (Satisfactory topsoil in cut sections may be used for plating slopes.)
The excavated topsoil (in excess of the amount needed for plating slopes indicated) and unstable material, shall be used in the construction of fill beyond this 2:1 slope as shown.
Under drawing of the typical xk cut section, the following appears:
Estimated station limits for cuts requiring plating mat’l. (Sta. limits subject to change during construction)
The station limits are listed under the above notation. The drawing of the cut section also provides for a sufficient amount of plating material to be stockpiled to plate the slopes in the cut sections to a depth of 4 to 6 inches between the station limits as indicated. Under the drawing of the typical xh cut section, the following appears: “4" to 6" plating mat’l. from roadway stockpile (401-23-P)”.
The plan showing the xh fill section does not call for any plating material to be used on the slopes of the embankment.
*814 The plans provide that a sufficient amount of topsoil shall be stockpiled for plating slopes at the station limits indicated in the cut sections. The plan, however, gave the contractor the option of using plating material from the cut sections instead of using the plating material stripped from underneath the core section of the embankment. The testimony is uncontra-dicted that Dixie exercised this option by excavating the material suitable for plating from the cut sections and stockpiling it beyond the outer limits of construction of the cut sections. This option was to Dixie’s advantage because if it had stockpiled plating material from the fill section, the stockpile would have been located down in the fill section necessitating picking the plating material up from the stockpile, hauling it uphill to the cut section and spreading it. Stripping the plating material from the cut section and stockpiling it there, enabled Dixie to push it off with a dozer and place it on the slopes in the cut sections where plating material was required.
Dixie stripped the topsoil and unstable material to various depths under the core section of the embankment and cast the excavated material between the toe of the core embankment and the toe of the completed embankment. Dixie used this material to construct the embankment outside the core embankment and was paid for the excavation and placing the material in the embankment at the rate specified under Pay Item 23-A in accord with the plans and specifications.
In determining whether Dixie was entitled to be paid for plating material at the rate of $1.45 per cubic yard for all topsoil and unstable material excavated from the cut sections of the 11.4 mile portion of the project, we must consider the specifications and plans in some detail. In the contract development stage, economy of construction on the 11.4 mile section dictated utilization of all unclassified excavation in embankment construction, otherwise, additional costs would have been incurred in disposing of quantities of unstable materials and replacing these materials in the construction. The design assured the stability of the core embankments by requiring construction of the core embankment from stable soil, determined from coring, to be obtained from the cut sections. The Commission determined that the total excavation from the cut sections, including topsoil, was stable material satisfactory for use in construction of the embankments in the fill sections. The excavation and placing of this material is governed under the standard specifications which follow.
Section 23 of the standard specifications is entitled Roadway and Drainage Excavation. Section 23.01 states:
The work completed by this section consists of excavating and placing in embankments or otherwise satisfactorily disposing of all excavated material, of whatever character within the limits of the work, . . .
It shall include all excavation, shaping and sloping . . . necessary for the construction, preparation and completion of all embankments, sub-grades, shoulders, ... as shown on the plans, or as directed.
Section 23.03.
All suitable materials excavated shall be used insofar as practicable in the formation of a roadbed including the embankment, sub-grade, shoulders, slopes, back fill for structures and at such other places as directed... .
Section 23.07.
Embankments shall be constructed with suitable materials excavated as provided in this section....
As previously stated, Dixie exercised its option, stripped, and stockpiled a sufficient amount of plating material from the cut sections instead of stockpiling plating material excavated from under the core embankment in the fill sections. The Commission admits Dixie was entitled to be paid for this plating material under Pay Item No. 401-' 23-P at the rate of $1.45 per cubic yard. The remaining excavation from the cut sections was used by Dixie to construct the embankments in accord with the specifications quoted above and Dixie was paid for this work under Pay Items 23-A and 32-A, *815 $0.62 per cubic yard and $0.0025 per station yard haul respectively.[3]
Dixie argues that Special Provision No. 1642 changes the plans and specifications, thereby entitling it to be paid for all topsoil and unstable material excavated from the cut sections as plating material at the rate of $1.45 per cubic yard instead of unclassified excavation at the rate of $0.62 per cubic yard, because the standard specifications provide that special provisions shall govern over both plans and specifications. Section 5.04 of the standard specifications provides in part:
Coordination of Plans, Specifications, and Special Provisions: These specifications, the plans, special provisions, and all supplementary documents are essential parts of the contract, and a requirement occurring in one is as binding as though occurring in all. They are intended to be complementary, to describe and provide for a complete work. In case of discrepancy, figured dimensions, unless obviously incorrect, shall govern over scaled dimensions. Plans, generally, shall govern over specifications, and special provisions shall govern over both plans and specifications.
Special Provision No. 1642 follows:
SPECIAL PROVISION NO. 1642
SECTION 401-23
PROJECT NO. 1-10-1 (15) 16
HANCOCK & HARRISON COUNTIES
MISSISSIPPI STATE HIGHWAY DEPARTMENT
DATE: 10-18-67
SUBJECT: Unclassified Excavation
(Plating Material)
Section 23, Roadway and Drainage Excavation, of the 1956 Standard Specifications for Road and Bridge Construction, is hereby amended as follows for the item of Unclassified Excavation (Plating Material), Only:
Article 401-23.07 — Embankment Construction:
After line 38, page 72 insert:
Material designated on the plans or by the Engineer as “Stripping or Unstable Material” (Muck Excluded) shall be classed as Unclassified Excavation— “Plating Material” — to be used in embankment construction and plating of designated cut slopes. Such material shall have been removed and stockpiled under Items 23-A and 32-A. Payment for haul to stockpile will be shown on Contract Plans.
Plating Material placed in embankment or on cut slopes shall be compacted to nominal density by means of heavy tractor treads, sufficiently to maintain its section. Thicknesses shall be as designated on the plans and typical sections, or ordered. Stockpiled Material in excess of immediate needs shall be bladed into neat windrows, with due attention to drainage, for use on subsequent contracts).
Article 401-23.12 — Method of Measurement:
After line 37, page 78, insert:
E. Final Position Measurement. Unclassified Excavation (Plating Material) will be measured in its final position (F.P.M.) in the embankment or on cut sections by the cubic yard (average end area method) of properly shaped, compacted and finished sections within allowable tolerances. The volume of Plating Material allowed will be determined by deducting the volume of previously cross-sectioned embankment and cut sections.
Delete Article 23.13 in toto and insert (as applicable to this item, only)
Article 401-23.13 — Basis of Payment: This item, measured as prescribed, will be paid for at the contract unit price bid which price shall be full compensation for hauling and satisfactory disposal of all excavation necessary in the preparation, construction and completion of the work, including formation and compaction of outer portions of the embankment, shaping the right-of-way, windrowing excess material; and for all equipment, tools, *816 labor and incidentals necessary to complete the work.
Payment will be made under:
Pay Item NO. 401-23-P: Unclassified Excavation (Plating Material)
(F.P.M.) ~ per Cubic Yard
Special Provision 1642 amends three sections of the Standard Specifications. The first amendment consists of two paragraphs to be inserted after the first paragraph of section 23.07 of the Standard Specifications entitled, “Embankment Construction: A. Materials.” The first paragraph of this amendment defines plating material as, “Material designated on the plans or by the engineer as ‘stripping or unstable material’ ” and specifies that plating material is to be used in embankment construction and plating of designated cut slopes. In sum, this paragraph tells the contractor where plating material will be obtained.
The second paragraph specifies where the plating material will be placed in the completed construction and provides, “Thicknesses shall be as designated on the plans and typical sections, or ordered.” This limits the use of plating material to the place designated on the plans and typical sections. In order to determine the depth of and where the plating material was to be placed, it was necessary to refer to the plans and typical sections. The plans and typical sections specify plating the embankment to a thickness of 12 inches on the .9 mile section but does not specify the use of plating material on the embankments in the 11.4 mile section of the project. The plans and typical sections also specify that the slopes of the cut sections of the 11.4 miles section of the project shall be plated to a thickness of 4 to 6 inches.
This amendment specifies that plating material is to be used in the embankment construction, but the location and thickness of the plating material in the completed construction can be ascertained only be referring to the plans and typical sections and not by referring to this special provision alone.
Dixie argues that all material designated on the plans or by the engineer as stripping or unstable material, muck excluded, should be classed as plating material. In support of this argument Dixie contends that special provisions govern over plans and specifications as set out in section 5.04 of the standard specifications. Dixie’s argument that special provisions shall govern over plans and specifications applies only if there is a conflict between the special provisions and the plans and specifications. When the special provisions, the plans (including typical sections), and standard specifications are construed together as required by section 5.04, no conflict exists but they are complementary and describe and provide for a complete work.
We therefore hold that Dixie was entitled to be paid for plating material under Pay Item 401-23-P for the plating material only at the locations and to the thicknesses specified by the plans and typical cut sections.
This amendment also provides that plating material stockpiled in excess of the needs for the project shall be windrowed for use on subsequent contracts. Proof shows that no excess plating material was windrowed and Dixie makes no claim for having windrowed any excess plating material.
The second amendment of the standard of specifications effected by special provision No. 1642 amends section 231.12 entitled, “Method of Measurement,” by inserting paragraph E. This amendment provides that plating material will be measured in its final position in the embankment or on cut sections by the cubic yard of properly shaped, compacted and finished sections.
The third amendment of the standard of specifications by Special Provision No. 1642 amends section 23.13 entitled, “Basis of Payment” by deleting section 23.13 and inserting the amendment as applicable to this item (plating material) only. The amendment provides that plating material will be paid for at the contract unit price bid which shall be full compensation for hauling- and satisfactory disposal of all excavation necessary in the preparation, construction and *817 completion of the work, including formation and compaction of outer portions of the embankment, shaping the right-of-way, and windrowing excess material. The effect of these two amendments is that plating material will be measured in its final position in the embankment or on the cut sections and will be paid for at the contract unit price bid after measurement as prescribed. There is no conflict between these amendments and the plans because the plans clearly show where the plating material is to be placed.
Dixie argues alternatively, if it is not entitled to pay for the unclassified excavation not used as plating material under Pay Item 401-23-P, it is entitled to be paid for a second handling of this material under Pay Item 23-A at the rate of $0.62 per cubic yard. Dixie relies on section 23.03 which provides in part, the following:
Stockpiling Materials. Excavation, . . . shown on the plans or required by the Engineer to be stockpiled and reserved for later use in the work by the Contractor, which requires more than one handling, will be paid for at the contract unit price for Unclassified Excavation,

Dixie argues that the 23-A material, which was unclassified excavation, was handled twice thereby entitling it to additional compensation under section 23.03 D. There is no merit to this argument because the 23-A material was not required to be stockpiled. To the contrary, sections 23.01, 23.03 and 23.07 require 23-A material to be excavated, placed in the embankments, shaped, and compacted, and does not contemplate a second handling of the material. Pay Item 23-A covers all the above work except for hauling the material more than 100'. Dixie was entitled to and was paid for hauling under Pay Item 32-A.
We hold the Commission offered Dixie all it was due under the contract, and stated in its answer that it was willing to pay Dixie the balance of $25,000 retained on the contract. Dixie declined to accept the offer and filed suit. We therefore reverse and render, and enter judgment here for Dixie in the amount of $25,000 with interest from the date the mandate is filed in the trial court.
REVERSED AND RENDERED.
PATTERSON, C. J., SMITH and ROBERTSON, P. JJ. and WALKER, BROOM, LEE and BOWLING, JJ., concur.
HAWKINS, J., takes no part.

. Mississippi State Highway Commission v. Dixie Contractors, Inc., 375 So.2d 1202 (Miss. 1979).

. F.P.M. is explained in the specifications and testimony as meaning Final Position Measurement.

. A station yard haul is a haul of one cubic yard one hundred feet.