# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-CA-00383-SCT

*TEXIE RAE WALLACE*

*v.*

*UNITED MISSISSIPPI BANK*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/30/96 |
| TRIAL JUDGE: | HON. HYDE RUST JENKINS, II |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAVID WAYNE BARIA |
| ATTORNEY FOR APPELLEE: | JOHN GREEN |
| NATURE OF THE CASE: | CIVIL - TORTS (OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE) |
| DISPOSITION: | REVERSED AND REMANDED - 7/2/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/3/98 |

**BEFORE PITTMAN, P.J., BANKS AND WALLER, JJ.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This matter involves the propriety of a bank setting off loans to the deceased against funds held in joint certificates of deposit ("CDs"). Summary judgment was entered in favor of the bank. We find that none of the legal bases on which the bank depends gave it the right to set off the subject CDs against the disputed notes, and that the plaintiff was entitled as a matter of law to the remaining value of the CDs after they were set off against the two notes for which they had been specifically pledged. The plaintiff was likewise entitled to summary judgment on her conversion claim. The issue of accord and satisfaction is remanded for further proceedings, as the defendant bank did not show proof sufficient for summary judgment that there was clear and convincing evidence that there was an accord and satisfaction in this case.

## I.

¶2. Jerry Wallace had been a business customer of Appellee United Mississippi Bank (UMB) for a number of years prior to his death on March 20, 1989. During this time UMB extended lines of credit to Jerry Wallace, and also to his businesses, Wallace Auto Sales and Wallace Mobile Homes. These

loans were evidenced by various notes signed by Mr. Wallace, and each was executed on a form which contained a provision allowing the bank to set off "any amount I owe you under this note against any right I have to receive money from you."

¶3. At the time of his death, Jerry Wallace and his wife, Texie Rae Wallace, were listed as owners on two CDs purchased from UMB. The CDs were originally issued in joint names, with full rights of survivorship. These non-negotiable CDs were numbered 16523 and 16524 and had a combined value, excluding interest, of $69,229.88. Clarence Young, Executive Vice President of UMB from 1986 until 1991, stated in his affidavit that the CDs themselves contained a specific clause which provided that "[e]ach of you who has the right to withdraw from this account agrees that we may set-off any debt you owe us now or later against the amount of money you could withdraw from this account." Young stated that the CDs also contained a provision regarding pledges of the certificates, specifying that such pledges must be satisfied before the rights of any joint account survivor become effective. This provision was apparently signed only by the decedent, Jerry Wallace.

¶4. On February 21, 1989, Jerry Wallace had pledged the CDs for two loans extended to him by UMB on that day, evidenced by loan numbers 6816482 and 6843940. These two loans totaled $30,250.00. The CDs were not specifically pledged for any other loans which Jerry Wallace took from UMB. On the same day that he took out loan numbers 6816482 and 6843940, Mr. Wallace executed assignments of the two certificates to UMB. Each of these assignments transferred "all right, title and interest of the undersigned" in each of the accounts "for the purpose of securing payment of each and every debt, liability or obligation of every type or description which any of the undersigned may now or at any time hereafter owe to the Depository Institution, whether such debt, liability or obligation now exists or is hereafter created or incurred." Each of the assignments was signed individually by Jerry Wallace.

¶5. Pursuant to another provision in the notes, all the loans to Jerry Wallace and his various businesses became in default on the date of his death. At this time, his debt with UMB totaled $264,309.75. The chancery court, however, had specifically authorized the two co-administratrices of Mr. Wallace's estate to continue the operation of the decedent's businesses.[1] Thus, UMB continued to re-work the loans in the months after Mr. Wallace's death in an effort to reduce the indebtedness of his estate. On June 22, 1989, UMB probated its claim for $102,609.30, which was allowed and registered by the chancery court.

¶6. In August of 1989, when the CDs matured, Texie Rae Wallace went to the bank and requested that she be paid the face amount, or be allowed to "roll over" the CDs as her husband had done in the past. Alternatively, she requested that the bank set off against the CDs only for the two loans for which they had specifically been pledged, and pay her the balance. The bank refused all of these requests.

¶7. On June 13, 1990, the Executive Vice President of UMB, Clarence Young, wrote to the co-administratrices advising them that the bank had been in a "waiting position" since the probate of its claim, and that since the indebtedness occupied a "seriously past-due status" the bank was going to "exercise its legal prerogatives under the terms of the instruments." As part of its planned action, the bank indicated that "[n]otes of Jerry Wallace/Texie Rae Wallace and Wallace Mobile Homes, principal plus accrued interest, will be set off against CD # 16523 and CD # 16524," and the residue

paid into the chancery court for disposition.

¶8. W. Stewart Robison, counsel for Texie Rae Wallace, wrote to UMB on June 14, 1990, and emphasized that the CDs in question were jointly owned by Jerry Wallace and Texie Rae Wallace, and "that under Mississippi law the certificates became the sole property of Texie Rae Wallace, upon the death of Mr. Wallace, subject only to outstanding security interests." Mr. Robison also insisted that "[i]f the Bank persists in its announced plan of set off, any residue of certificates of deposit numbered 16523 and 16524 should be immediately paid to Texie Rae Wallace" rather than into the chancery court. Walter Brown, counsel for Debra Wallace-Blackwell, agreed that the residue could be paid directly to Texie Rae Wallace, although Mr. Robison was to hold the check pending a meeting on July 11, 1990, at which the parties could "hopefully iron out all of the remaining questions regarding this estate." Mr. Robison emphasized that whether or not all matters were settled to the mutual satisfaction of their clients, he would deliver the check to Texie Rae Wallace.

¶9. UMB set off against the CDs for the outstanding indebtedness owed by Jerry Wallace on note numbers 6816482 and 6843940--for which Mr. Wallace had specifically pledged the CDs--and for five other notes of Wallace Mobile Homes totaling $28,829.58. All five of these other notes were signed prior to the execution of the assignments of the CDs by Mr. Wallace, and were otherwise secured by new and used mobile homes.[2] The total value of the CDs at the time of set-off was $72,172.15, against which a total of $63,032.77 in debt was set off. On June 19, 1990, the balance of $9,139.38 was sent to Mr. Robison on behalf of Texie Rae Wallace.

¶10. On motion by Texie Rae Wallace, the chancellor ordered the matter of UMB's set-off of the decedent's debts to be assigned a new cause to proceed independent of the estate of Jerry Wallace. Appellant Texie Rae Wallace filed an Amended Complaint on March 4, 1994, requesting an accounting and damages for UMB's negligence and conversion of her assets. UMB filed its Defense and Answer to Amended Complaint on April 5, 1994, averring that the plaintiff had no cause of action and requesting dismissal of the Amended Complaint.

¶11. On September 2, 1994, Appellee UMB filed its Motion for Summary Judgment. Attached to the bank's motion are the affidavits of Debra Wallace-Blackwell and Clarence Young. The bank contends that it is due judgment as a matter of law by virtue of the set-off provisions in the notes, the CDs, and the assignments executed by Mr. Wallace. UMB further contends that the "agreement" between attorneys Robison and Brown constituted accord and satisfaction of the claims of Texie Rae Wallace, and that she was thereby "estopped by the Agreement signed by her attorney and negotiation of the settlement check issued by United Mississippi Bank."

¶12. On December 27, 1994, Texie Rae Wallace filed her Plaintiff's Cross Motion for Summary Judgment. In her motion, she argues that since the CDs in question were not negotiable, they were not covered by the provisions of Article 3 of the Uniform Commercial Code, but rather by Miss. Code Ann. § 81-5-63. Texie Rae Wallace contends that pursuant to this statute, the subject CDs passed directly to her as joint tenant upon the death of her husband, subject only to the security interests of the bank in such CDs. She alleges that the estate of Jerry Wallace never possessed a pecuniary interest in the CDs. Accordingly, she sought a declaration that UMB did not act in a commercially reasonable manner in setting off her deceased husband's loans and converting her interest in the CDs. She requested a money judgment in her favor in the amount of $50,000.00, plus

attorney's fees and all costs of court.

¶13. The chancery court heard both motions for summary judgment on February 24, 1995. On January 30, 1995, the court issued an Opinion granting summary judgment in favor of Defendant UMB. In addition, the court found that the plaintiff had accepted and negotiated a settlement offer from UMB by accepting its check for $9,139.38 without an express reservation of rights, constituting an accord and satisfaction of her claim. Texie Rae Wallace appeals from this judgment.

## II.

¶14. This Court employs a *de novo* standard in reviewing a grant of summary judgment. *Allen v. Mac Tools, Inc.,* 671 So. 2d 636, 640 (Miss. 1996); *National Farmers Union Property & Cas. Co. v. First Columbus Nat'l Bank,* 669 So. 2d 767, 769 (Miss. 1996); *Owen v. Pringle,* 621 So. 2d 668, 670 (Miss. 1993). "A trial court may grant summary judgment if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Roussel v. Robbins,* 688 So. 2d 714, 725 (Miss. 1996); *Morgan v. City of Ruleville,* 627 So. 2d 275, 277 (Miss. 1993). *See also* Miss. R. Civ. P. 56. However, notwithstanding our respect for and deference to the trial judge, on matters of law "it is our job to get it right." *Cooper v. Crabb,* 587 So. 2d 236, 239 (Miss. 1991) (quoting *UHS-Qualicare, Inc. v. Gulf Coast Community Hosp., Inc.,* 525 So. 2d 746, 754 (Miss. 1987)).

## III.

¶15. Appellant Texie Rae Wallace contends that UMB had no right to set off against the CDs which she jointly owned with the decedent any debts for which they were not expressly pledged. Thus, she specifically contests the bank's set-off of the four loans numbered 6831523, 6873913, 6877617 and 6888036, totaling $28,829.50. The appellant contends that pursuant to Miss. Code Ann. § 81-5-63, the CDs became vested in her upon the death of her husband.[3] The appellant cites *Stamper v. Edwards,* 607 So. 2d 1141 (Miss. 1992). In *Stamper*, this Court held that a certificate of deposit issued by a bank to the decedent, Susie Mae Stamper, and made "Payable on Death to Bob Williams, " *id.* at 1151, constituted no part of the estate of Susie Mae Stamper but rather, by reason of § 81-5-63, "became vested in Bob Williams at the death of Susie Mae Stamper." *Id.* at 1152. *Stamper* thus stands for the proposition that under Mississippi law a CD with survivorship provisions represents "an enforceable will substitute." *Id. See also Cooper v. Crabb,* 587 So. 2d at 239; *In re Will of McCaffrey v. Fortenberry,* 592 So. 2d 52, 64 (Miss. 1991) ("[i]t is, of course, well settled that survivorship property becomes the property of the survivor, and the joint tenant's estate has no interest in these funds").

¶16. In the present case, however, UMB argues that the set-off provisions in the notes, the set-off provisions in the CDs themselves, and the set-off and dragnet provisions in the assignments executed by Jerry Wallace give the bank the contractual right to set off the four loans as it did. UMB also claims a common law right of set-off by which "the bank itself has a right to set off the amount it owes the depositor against the amount owed it by the depositor." Each of these bases of the bank's claimed right of set-off is discussed in turn.

*1. UMB's Common Law Right of Set-off*

¶17. As to the bank's common law right of set-off, it is "well settled that a bank, under a 'set off' principle, has the right to apply a debtor's deposit to payment of his debt then due aside from any security agreement specifically authorizing it to do so." *Deposit Guar. Nat'l Bank v. B. N. Simrall & Son, Inc.,* 524 So. 2d 295, 299-300 (Miss. 1987). The relationship existing between a bank and a depositor is one of debtor and creditor, and a bank may apply "whatever amount the maker of the note has on deposit with it to a payment on the note." *Id.* at 300 (quoting *Moreland v. Peoples Bank of Waynesboro,* 114 Miss. 203, 211-12, 74 So. 828, 829-30 (1917)). *Simrall* further explains that the right of the bank to set off the deposit of its debtor applies to the depositor's *matured* debts, "upon the theory that, as the depositor is indebted to the bank upon a demand which is due, the funds in its possession may properly and justly be applied in payment of such debt. . . ." *Id.* (quoting *Marmon Fanning Co. v. People's Nat'l Bank,* 150 A. 402, 404 (N.J. Eq. Ct. 1930)).

¶18. "The right of the bank exists only where with respect to both debt and deposit the bank and the depositor are in debtor-creditor relationship, and there must be mutuality of demands. The debts must be between the same parties and in the same "right" or capacity." *Central Bank of Mississippi v. Butler,* 517 So. 2d 507, 511 (Miss. 1987) (quoting *Kaufman v. First Nat'l Bank of Opp, Alabama,* 493 F.2d 1070 (5th Cir. 1974)). Other states have agreed that the principle of mutuality applies to joint accounts. *See, e.g., Selby v. DuQuoin State Bank,* 584 N.E. 2d 1055, 1057 (Ill. App. Ct. 1991) (under common law, bank has power to apply deposit to payment of such depositor's indebtedness only when there are mutual demands and debts between the parties and right of setoff arises at time depositor's indebtedness to bank has matured); *Greenwood v. Bank of Illmo*, 782 S.W.2d 783, 786 (Mo. Ct. App.1989) ("[i]t is a general rule of practically universal application at law that, to warrant a set-off, the demands must be mutual and subsisting between the same parties and must be due in the same capacity or right.'"); *City Nat'l Bank of Beaumont v. American Sur. Co. of New York*, 52 S.W.2d 259, 262 (Tex. Comm'n App. 1932) ("'. . .it is familiar law that mutuality is essential to the validity of a set off, and that, in order that one demand may be set off against another, both must mutually exist between the same parties.").

¶19. In the present case, all of the loans to Jerry Wallace became in default, and thus matured, on the date of his death. The bank's right of set-off therefore came into being at the moment Jerry Wallace died. At the same time, however, Texie Rae Wallace became the sole owner of the CDs, since under § 81-5-63 they became vested in her at the death of Jerry Wallace. *See Stamper,* 607 So. 2d at 1152. Thus, the issue is whether a bank's right of set-off which commences at the death of a debtor co-tenant prevails over the right of the surviving joint tenant who would otherwise assume full ownership of the property at the same time.

¶20. This is a case of first impression in Mississippi. In other states, however, the "general rule" is that in the absence of statutory authority or a contract to the contrary the right to set off a debt of a deceased joint tenant against the interest of a surviving joint tenant does not exist. *Selby,* 584 N.E. 2d at 1057; *Donnelly v. First Mut. Sav. Ass'n of Florida,* 509 So. 2d 1273, 1274 (Fla. Dist. Ct. App. 1987). In *Guilds v. Monroe County Bank,* 200 N.W. 2d 769 (Mich. Ct. App. 1972), the plaintiff brought suit against the defendant bank to recover funds on deposit in a joint savings account with survivorship rights which she had owned with her deceased husband. *Id.* at 770. The bank claimed a right of set-off even though it took no action during the lifetime of the deceased to secure the indebtedness by obligating the joint account. *Id.* at 771. The court found that the effect of the

state's survivorship statute is to "create a joint tenancy and unless a contrary intention is shown the survivor is entitled to the proceeds of the account."[(4)] *Id.* The court ruled that "here there is no proof to overcome the statutory presumption and as of the date of death the funds on deposit became solely those of the surviving wife. . ." *Id.* at 772.

¶21. As in *Guilds,* our statute, § 81-5-63, creates a presumption of joint tenancy. We find, therefore, that in Mississippi the general rule applies--namely, that in the absence of countervailing statutory authority or a contract to the contrary, the bank has no right to set off a debt of a deceased joint tenant against the interest of a surviving joint tenant. Texie Rae Wallace was presumed to be the sole owner of the CDs at the time the debt to the bank matured, yet was not a party to the note agreements held by the bank. Unless the bank can rebut this presumption of sole ownership there was no apparent mutuality between the parties holding the offsetting debts. *Butler,* 517 So. 2d at 511; *Selby,* 584 N.E. 2d at 1057; *Sandler v. United Indus. Bank,* 256 N.Y.S.2d 442, 444 (N.Y. App. Div. 1965). Thus, the common law right of set-off does not provide an independent basis for the bank's actions in the present situation, and this Court must look to whether the bank had a contractual right of set-off pursuant to any agreement by the parties.

*2.    UMB's Right of Set-off under the Note Provisions*

¶22. UMB argues that it had a right of set-off pursuant to the set-off provisions in the notes. Each of the notes executed by Jerry Wallace contained the following provision:

> **SET-OFF** -- I agree that you may set-off any amount I owe you under this note against any right I have to receive money from you. This includes:
>
> (a) any deposit account balance I have with you, including savings, checking, and NOW accounts, and any time deposit (including certificates of deposit);
>
> (b) any money owed to me on an item presented to you or in your possession for collection or exchange; and
>
> (c) any repurchase agreement or other non-deposit obligation.
>
> If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a fiduciary. It also does not apply to any IRA account or other tax-deferred retirement account.

¶23. "The right of persons to contract is fundamental to our jurisprudence and absent mutual mistake, fraud and/or illegality, the courts do not have the authority to modify, add to, or subtract from the terms of a contract validly executed between two parties." *First Nat'l Bank of Vicksburg v. Caruthers,* 443 So. 2d 861, 864 (Miss. 1983). *See also* *Griffin v. Tall Timbers Dev., Inc.,* 681 So. 2d 546, 555 (Miss. 1996). There is nothing in the note provisions above which evidences an intent by the parties to override the presumption of joint ownership and survivorship provided by § 81-5-63.

¶24. In any event, Texie Rae Wallace was not a party to the note agreement and her individual right

of survivorship could not be compromised without her consent. *See, e.g.,* ***Strange v. Strange,*** 548 So. 2d 1323, 1328 (Miss. 1989) (will executed subsequent to a joint tenancy purporting to dispose of joint tenancy funds to other source does not affect right of survivorship). *See also* ***In re Estate of Bodman v. Bodman,*** 674 So. 2d 1245, 1248 (Miss. 1996). Here, the contractual right of set-off applies to the interest which the debtor himself had in the account, and in the amount which he could withdraw on his sole endorsement. Had Jerry Wallace's debts become due while he was still alive, the bank could have set off against the whole amount of the CDs. His interest was extinguished, however, when he died. ***Stamper,*** 607 So. 2d at 1147; ***McCaffrey,*** 592 So. 2d at 64. Thus, there was no interest against which the bank could set off his debts.

### 3. *UMB's Right of Set-off under the CD Provisions*

¶25. UMB next argues that it had a right to set off Jerry Wallace's debts against the CDs by virtue of the provisions in the certificates.[5] Clarence Young, Executive Vice President of UMB from 1986 until 1991, stated in his affidavit that the CDs themselves contained a specific provision which read:

> Each of you who has the right to withdraw from this account agrees that we may set-off any debt you owe us now or later against the amount of money you could withdraw from this account. For example, if any one of the three of you can withdraw all the money from this account, then the debt of any one of you can be set-off against the balance in this account (even though the others are not obligated on the debt). We may exercise this right of set-off, without notice to you, any time your debt is in default. . . .

According to Young's affidavit, this agreement was signed only by the decedent.

¶26. Similar to the provisions in the notes signed by Jerry Wallace, this agreement describes no more than UMB's purported right to set off any matured debt owed to the bank against the interest held by the debtor. The debtor's interest in the joint account, as long as he is alive, is equal to "the balance in this account," as the agreement stipulates. There is nothing in the agreement, however, which evidences an intention to reach the survivorship interest belonging solely to the non-debtor co-tenant. Further, the CD provision was not signed by Texie Rae Wallace. As discussed above in regard to the note provisions, we find that upon Jerry Wallace's death there was no interest against which the bank could set off his debts.[6]

### 4. *UMB's Right of Set-off under the Assignments*

¶27. Finally, UMB claims that it had a right of set-off pursuant to the assignments executed by Jerry Wallace on February 21, 1989. Each of these forms, entitled "Assignment of Time/Savings Account," assigned "all right, title and interest of the undersigned" in each of the accounts

> for the purpose of securing payment of each and every debt, liability or obligation of every type or description which any of the undersigned may now or at any time hereafter owe to the Depository Institution, whether such debt, liability or obligation now exists or is hereafter created or incurred, . . . . If said account is evidenced by a certificate of deposit, the foregoing assignment shall be construed as a grant of a security interest, subject to the extent applicable to

the Uniform Commercial Code of the state wherein this agreement is signed.

Each of the assignments was signed individually by Jerry Wallace.

¶28. Texie Rae Wallace argues that there is no mention of any *specific* antecedent debt in either of the assignments, and thus the bank wrongly assumed that the assignments allowed it to "dragnet" all debt, including that which existed before the assignments were executed.[7] She argues that this Court's holding in *Merchants Nat'l Bank v. Stewart,* 608 So. 2d 1120 (Miss. 1992) established the rule that antecedent debts will not be deemed within a dragnet clause unless they are specifically identified in the instrument. We note that this is an overstatement of the holding in *Stewart,* although at least one other court has cited the case for the same proposition. *See In re Lewis,* 212 B.R. 827, 829 (Bankr. E.D. Va. 1997).

¶29. In *Stewart,* this Court considered the scope of a hypothecation agreement containing a dragnet provision. The case involved the sale of a farm by the Stewarts to their son and son-in-law, who agreed that the purchase price would include a balance of $400,000.00 on the original purchase still owed by the Stewarts plus the assumption of a small business loan in the amount of $108,000.00. *Stewart,* 608 So. 2d at 1122-23. A series of transactions then took place on the same day. First, the son and son-in-law each executed a deed of trust in favor of the elder Stewarts in the amount of $170,000.00 for the purchase of land. Second, the son and son-in-law signed a second deed of trust in favor of the bank. This secured a note for the remainder of the purchase money, which was also guaranteed by the Farmers' Home Administration. Third, the son and son-in-law signed notes for crop production and irrigation loans. Finally, the elder Stewarts signed a hypothecation agreement in favor of the bank to collateralize these crop and irrigation loans. The security given by the Stewarts was an assignment of the first deeds of trust owed to them by the son and son-in-law. *Id.* at 1125.

¶30. The issue before the Court was whether the hypothecation agreement, executed for the purpose of securing the crop and irrigation loans, also covered the note for the purchase money secured by the second deed of trust. *Id.* The bank relied upon a dragnet clause in the agreement which granted the bank

> a security interest in said property to secure payment of such loan or loans, including but not limited to loans made under said line of credit, and all renewals and extensions thereof without limitation, including any loans that may be over said line of credit, *and also for any and all other indebtedness of Borrower to you, created at any time before you shall have received written notice from me terminating this Hypothecation Agreement* and all renewals and extensions thereof.

*Id.* at 1125 n.4 (emphasis supplied by the *Stewart* Court).

¶31. In determining whether the dragnet clause encompassed existing debt, the Court in *Stewart* relied upon various general principles of law. As an initial matter, it noted that the intent of the parties at the time the agreement is drafted is crucial in matters of contract interpretation. *See id.* at 1126. *See also Newell v. Hinton,* 556 So. 2d 1037, 1042 (Miss. 1990); *Roberts v. Roberts,* 381 So. 2d 1333, 1335 (Miss. 1980). "If the document is clear and unambiguous as to the collateral securing other debts we have found intent to secure these debts." *Stewart,* 608 So. 2d at 1126 (citing *Newton*

*County Bank, Louin Branch Office v. Jones,* 299 So. 2d 215, 218 (Miss. 1974) and *Trapp v. Tidwell,* 418 So. 2d 786, 792 (Miss. 1982) ("[t]here is no question that dragnet clauses are enforceable if properly executed and stated in clear and unambiguous language.")). *Stewart* implicitly holds that where an agreement employs broad language which purports to secure all debts of a borrower, but does not specifically list existing debt, then the agreement is ambiguous as to whether the antecedent debt is secured by the agreement.

¶32. In such cases certain principles must be applied to determine the intent of the parties. First, it must be considered whether the dragnet clause employed in the agreement is "boilerplate." The *Stewart* Court noted that "[o]ften these clauses are not discussed between the borrower and the lender so that the borrower is not aware of the existence or the effect of these clauses." *Stewart,* 608 So. 2d at 1126 (citing *United States v. American Nat'l Bank,* 255 F.2d 504 (5th Cir. 1958); *Matter of Ladner,* 50 B.R. 85 (Bankr. S.D. Miss. 1985); *First Sec. Bank v. Shiew,* 609 P.2d 952, 957 (Utah 1980); *Underwood v. Jarvis,* 358 So. 2d 731 (Ala. 1978); *Mohler v. Buena Vista Bank & Trust Co.,* 588 P.2d 894 (Colo. Ct. App. 1978)). Second, the nature of the secured debt must be examined to determine the validity of the dragnet clause with respect to other debt. Where the debt which the lender seeks to have included under the dragnet clause is different in kind from the primary debt secured by the agreement, it is less likely that it was intended to be encompassed by the agreement. *Stewart,* 608 So. 2d at 1126 (citing *Mark Twain Kansas City Bank v. Cates,* 810 P.2d 1154 (Kan. 1991); *Shiew,* 609 P.2d at 957-58; *Wong v. Beneficial Sav. and Loan Ass'n,* 128 Cal.Rptr. 338, 342 (Cal. App. 1976)). Third, heavy emphasis is placed on the fact that the antecedent loans are not listed in the agreement. "The rationale for excluding antecedent loans is that they are known to the lender at the time the agreement is drafted and should be included, if there is an intent to do so, since those loans are easily identifiable." *Stewart,* 608 So. 2d at 1126 (citing *Lundgren v. National Bank of Alaska,* 742 P.2d 227, 235 (Alaska 1987); *First Nat'l Bank & Trust Co. v. Lygrisse,* 647 P.2d 1268, 1272-73 (Kan. 1982); *Jarvis,* 358 So. 2d at 735; *Kamaole Resort Twenty-One v. Ficke Hawaiian Investments,* 591 P.2d 104, 112 (Haw. 1979)). Finally, this Court will consider whether the debt which the lender seeks to have included under the dragnet clause is otherwise fully secured. *Id.* at 1127.

¶33. Applying these principles, the *Stewart* Court held as a matter of law that the dragnet provision of the hypothecation agreement did not encompass the second mortgages. *Id.* at 1126. The Court determined that the language used in the agreement was boilerplate, in that the agreement was a standard form used by the bank. The primary debt secured by the agreement was a line of credit to be used for crop production and irrigation, and was different in nature from the loans made to purchase the land. *Id.* at 1126-27. The bank was clearly aware of the antecedent debt which it sought to include under the dragnet provision, and could have easily and explicitly included it within the agreement. *Id.* at 1126. Finally, the Court noted that the fact that the antecedent debt was otherwise fully secured further indicated that it was not intended to be included under the hypothecation agreement. *Id.* at 1127.

¶34. In the instant case, the circumstances present a closer question because of the second *Stewart* factor. On the same day he executed the assignments, Jerry Wallace took two business loans from UMB evidenced by note numbers 6816482 and 6843940. He pledged the CDs for these notes. The two loans were also secured by the assignments, however, as clearly stated on the face of the notes. Thus, the primary debt for which the assignments were executed--the two business loans--are of the

same nature as the debts which UMB seeks to include under the dragnet clause.

¶35. All of the other *Stewart* factors, however, support a finding that the assignments do not include the antecedent debt evidenced by the notes numbered 6831523, 6873913, 6877617 and 6888036. As in *Stewart,* the dragnet language used by UMB in the assignments was boilerplate in nature as the assignments were on a standard form used by the bank. Moreover, there is no question that UMB was aware of the antecedent debt. These loans were taken out directly from UMB within the six-month period preceding Jerry Wallace's death. Thus, there is no excuse for UMB's failure to specifically include these loans within the assignments if it intended them to be encompassed by the assignments. Finally, all four of the loans were otherwise secured. The notes numbered 6831523 and 6873913 were secured by a Security Agreement granting the bank a security interest in all chattel paper owned by Jerry Wallace, as well as a Trust Receipt granting the bank a security interest in certain trailer homes worth over $30,000.00. The notes numbered 6877617 and 6888036 were secured by the base note, which was in turn secured by "all new and used mobile homes" owned by Wallace Mobile Homes.

¶36. Written instruments are to be construed narrowly against the drafter when there is uncertainty or ambiguity as to the intent of the parties. *Id.* at 1126. *See also **Clark v. Carter,*** 351 So. 2d 1333, 1336 (Miss. 1977); ***Stampley v. Gilbert,*** 332 So. 2d 61, 63 (Miss. 1976). We conclude, therefore, that under these circumstances the dragnet clause in the assignments does not encompass the antecedent debt.

## IV.

¶37. Plaintiff Texie Rae Wallace contends that the lower court erred in finding, as a matter of law, that the bank did not convert funds which properly belonged to her. Her argument has merit. The elements of conversion were set out in ***Mississippi Motor Finance, Inc. v. Thomas,*** 246 Miss. 14, 149 So. 2d 21 (1963), where we stated:

> It is well settled that the acts alleged to constitute a conversion must be positive and tortious. . .
>
> In ***McJunkin v. Hancock,*** 71 Okla. 257, 176 P. 740, the Court said: "To make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand. ***Sivils v. Aldridge,*** [62 Okl. 89], 162 Pac. 198." In ***Spooner v. Holmes,*** 102 Mass. 503, 3 Am.Rep. 491, Mr. Justice Gray, speaking for the Court, said: "Action of tort* * *cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself, or to deprive the rightful owner of it, or destroyed the property." In ***Lee Tung v. Burkhart,*** 59 Or. 194, 195, 116 P. 1066, the Court held that in order to maintain an action for conversion, there must have been, on the part of the defendant, some unlawful assumption of dominion over the personal property involved, in defiance or exclusion of the plaintiff's rights, or else a withholding of the possession under a claim of right or title inconsistent with that of plaintiff. . . .

***Mississippi Motor Fin.,*** 246 Miss. at 20-21, 149 So. 2d at 23. *See also **PACCAR Fin. Corp. v.***

*Howard,* 615 So. 2d 583, 588 (Miss. 1993). In *Walker v. Brown,* 501 So. 2d 358, 361 (Miss. 1987) this Court stated that "[c]onversion requires an intent to exercise dominion or control over goods which is inconsistent with the true owner's right."

¶38. In August of 1989, and at various other times, Texie Rae Wallace went to the bank and requested that she be paid the face amount of the CDs when they matured on August 21, or that she be allowed to "roll over" the CDs as her husband had done in the past. Alternatively, she requested that the bank set off against the CDs only for the two loans for which they had specifically been pledged, and pay her the balance. The bank refused all of these requests. The plaintiff alleges that the bank's refusal was based upon a letter from the co-administratrix, Debra Wallace-Blackwell, requesting that no activity be allowed on the accounts until estate matters were settled. UMB denies this, stating that it "refused to limit its set-off rights against only two of the loans inasmuch as the Bank had set-off rights against all the indebtedness of the late Jerry Wallace."

¶39. Whatever the reason for the bank's refusal to grant her requests, however, UMB had no right to set off against the CDs for the four disputed notes. The bank was in possession of funds belonging to the plaintiff, and refused to surrender any part of them even after the plaintiff made specific demands for her portion. The bank's conduct therefore constitutes "the exercise of a dominion in exclusion or defiance of the owner's right" as well as "a wrongful detention after demand."

¶40. It is not likely that the bank withheld the funds with the conscious realization that Texie Rae Wallace was entitled under the law to the remaining value of the CDs after they were set off against the two notes for which they had been specifically pledged. The bank's good faith, however, is not a defense to the claim that it converted her property. While conversion requires an intentional act, this Court has clearly held that the required intent does not have to be the "intent to be a wrongdoer." *Terrell v. Tschirn,* 656 So. 2d 1150, 1153 (Miss. 1995); *Walker,* 501 So. 2d at 361. In *Terrell,* this Court emphasized that good faith is not necessarily an excuse.

> The intent required is not necessarily a matter of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights. A purchaser of stolen goods or an auctioneer who sells them in the utmost good faith becomes a converter, since the auctioneer's acts are an interference with the control of the property. A mistake of law is no defense.

*Terrell,* 656 So. 2d at 1153 (quoting Prosser and Keaton on the Law of Torts 92-93 (W. Page Keaton 5th ed. 1984)). We conclude that the chancellor erred in granting summary judgment for the bank on the issue of whether it converted the plaintiff's funds. Moreover, this Court declares that the *plaintiff* was entitled to judgment as a matter of law on her conversion claim.

## V.

¶41. Texie Rae Wallace next contends that the lower court erred in granting UMB's motion for summary judgment on the issue of whether there was an accord and satisfaction of her claim against the bank. The lower court specifically found that the plaintiff had accepted and negotiated a settlement offer from UMB by accepting its check for $9,139.38 without an express reservation of

rights, constituting an accord and satisfaction of her claim.

¶42. The four elements of a valid accord and satisfaction under Mississippi law are (1) something of value offered in full satisfaction of demand; (2) accompanied by acts and declaration as amount to a condition that if the thing offered is accepted, it is accepted in satisfaction; (3) the party offered the thing of value is bound to understand that if he takes it, he takes subject to such conditions; and (4) the party actually does accept the item. *Alexander v. Tri-County Coop. (AAL),* 609 So. 2d 401, 404-05 (Miss. 1992); *Lovorn v. Iron Woods Prods. Corp.,* 362 So. 2d 196, 197 (Miss. 1978). In *Cook v. Bowie,* 448 So. 2d 286 (Miss. 1984), this Court further noted that an accord and satisfaction "must have all the essentials of a contract and may be express, or implied from the circumstances." *Id.* at 287 (quoting *Roberts v. Finger*, 227 Miss. 671, 677-78, 86 So. 2d 463, 465 (1956)).

¶43. In this case, Clarence Young, on behalf of UMB, wrote to Debra Wallace and Texie Rae Wallace on June 13, 1990 and advised them that the bank "will exercise its legal prerogative under the terms of the instruments ten (10) days from the date of this letter." Texie Rae Wallace's lawyer, Mr. Robison, immediately responded to Mr. Young and asserted their position that "the certificates became the sole property of Texie Rae Wallace, upon the death of Mr. Wallace, subject only to the outstanding security interests. Neither the estate of Jerry Wallace nor any other person or entity has any claim to any portion of the residue after set off." Mr. Robison also insisted that "[i]f the Bank persists in its announced plan of set off, any residue of certificates of deposit numbered 16523 and 16524 should be immediately paid to Texie Rae Wallace" rather than into the chancery court.

¶44. Walter Brown, counsel for Debra Wallace-Blackwell, agreed that the residue could be paid directly to Texie Rae Wallace and the check forwarded to her attorney, Mr. Robison. The two attorneys further agreed that Mr. Robison would hold the check pending a meeting on July 11, 1990 between the two attorneys and Debra Wallace-Blackwell, at which those parties could "hopefully iron out all of the remaining questions regarding this estate." Mr. Robison emphasized to Mr. Brown that whether or not all matters were settled to the mutual satisfaction of their clients, he would deliver the check to Texie Rae Wallace.

¶45. UMB thereafter mailed a letter and a check to Texie Rae Wallace. The letter announced that the check for $9,139.38 evidenced "the remainder of Certificates of Deposit # 16523 and 16524," and stated that "[t]his is in accordance with our previous conversations and conferences." The check itself contained typed language in the upper left corner which read, "bal. due after payment of indebtedness--Jerry Wallace and Wallace Auto/Wallace Mobile Homes." There are no other references to the payment and no other evidence of negotiations between the plaintiff and the bank in the record.

¶46. UMB argues that the negotiations between Mr. Robison and Mr. Brown constituted "an agreement by the attorneys for their representative clients and was sufficient for the Bank to proceed in reliance thereon." It is axiomatic, however, that Mr. Brown, as attorney for the estate, had absolutely no right to settle anything on behalf of the bank or on behalf of Texie Rae Wallace. As the appellant suggests, therefore, the Court must look solely to evidence which might support the existence of an agreement between UMB and Texie Rae Wallace.

¶47. As clearly required by the first three elements of a valid accord and satisfaction, there must be a "meeting of the minds of the parties." *Cook,* 448 So. 2d at 287 (quoting *Roberts,* 227 Miss. at 677-

78, 86 So. 2d at 465). This Court has held that an obligee may execute a valid accord and satisfaction by cashing checks which were offered as full satisfaction of a demand. *See, e.g., Lovorn,* 362 So. 2d at 197-98. In *Lovorn,* the debtor sent the creditor a check which contained language on the back that "[e]ndorsement of this check constitutes payment in full and without recourse. . ." *Id.* at 197. On these facts, this Court held that the acceptance of the check constituted a valid accord and satisfaction, given that it found that the recipient of the check should have known that the check was offered in full satisfaction of the debt. *Lovorn* thus stands for the proposition that while negotiation of a check may fulfill the fourth element of a valid accord and satisfaction, the offer to establish the accord--in light of other facts of which the obligee was aware--must be plain and unambiguous. *See id.* at 197. *Lovorn,* however, is clearly distinguishable from the present case. Here, there is no record evidence of any unequivocal language by UMB that would put Texie Rae Wallace on notice that her claims were being released by cashing the check.

¶48. The bank argues that accord and satisfaction was established by an excerpt from the deposition of Texie Rae Wallace, which was read at the summary judgment hearing. In this deposition she remarked that she had been "reluctant" to cash the check, but that her attorney replied, "[t]ake the check to the bank, cash it and stay out of there. The debt is paid." Even if this remark indicates some suspicion by Texie Rae Wallace that cashing the check might be deemed an acceptance, the present circumstances lack the element of an unambiguous *offer* by the bank. To satisfy all the elements of accord and satisfaction, it must also be shown that UMB tendered the check in complete settlement of the plaintiff's claim, even though no correspondence to the plaintiff contained any release-of-claims language. *See Young v. Southern Farm Bureau Life Ins. Co.,* 592 So. 2d 103, 106-07 (Miss. 1991) .

¶49. The burden of proving an accord and satisfaction "is upon the one who maintains the affirmative of that issue." *Simmons v. Langston,* 241 Miss. 36, 39, 128 So. 2d at 749, 750 (1961). Further, the elements must be proven by clear and convincing evidence. *Id.*; *Young,* 592 So. 2d at 106. Upon the present record UMB did not carry its burden of proof and we find that the chancellor erred in granting summary judgment for the defendant on the issue of accord and satisfaction. Thus, this issue is remanded for further proceedings.

## VI.

¶50. As the discussion of the above issues makes clear, we find that the plaintiff is entitled to summary judgment, as there are no genuine issues of material fact concerning UMB's wrongful set-off of the subject CDs against the notes numbered 6831523, 6873913, 6877617 and 6888036. We also find that the chancellor should have granted summary judgment for the plaintiff on the issue of conversion. Texie Rae Wallace was legally entitled to the value of the CDs--minus the amount set off against the specifically pledged and assigned notes--when the CDs matured on August 21, 1989. No reasonable factfinder could have found that the bank did not intend to exercise dominion or control over her property which was inconsistent with her rights as the true owner.

## VII.

¶51. For the foregoing reasons, this case is reversed and remanded to the Chancery Court of Adams County for further proceedings on the issue of accord and satisfaction. Should the plaintiff prevail on the merits of that claim, the court shall enter judgment for the plaintiff for the remaining value of the

CDs and assess damages on plaintiff's conversion claim.

**¶52. REVERSED AND REMANDED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., McRAE, ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR.**

1. The two co-administratrices of Jerry Wallace's estate were his wife, Appellant Texie Rae Wallace, and his daughter, Debra A. Wallace-Blackwell.

2. The five notes included note number 6831523, signed August 25, 1988; number 6873913, signed August 25, 1988; number 6877617, signed December 15, 1988; number 6888036, signed August 23, 1988; and base note number 6876767, signed October 15, 1987.

3. Miss. Code Ann. § 81-5-63 (1996) provides in pertinent part:

> When a deposit has been made or shall hereafter be made in the name of two (2) or more persons, . . .payable to any one (1) of such persons or the survivor, . . .or payable to the persons as joint tenants, such deposit or any part thereof or interest or dividends thereon may be paid to any one (1) of the said persons, without liability whether one or more of said persons be living or not, and the receipt of acquittance of the person so paid shall be a valid and sufficient release and discharge to the bank for any payment so made. The making of a deposit in such form, or the making of additions thereto, shall create a presumption in any action or proceeding to which either the bank or any survivor is a party of the intention of all the persons named on the deposit to vest title to the deposit and the additions thereto and all interest or dividends thereon in the survivor or survivors.

4. The Michigan court was interpreting a statute similar in effect to Miss. Code Ann. § 81-5-63. The Michigan statute provides that when a deposit has been made "in the names of 2 or more persons, payable to either or the survivor or survivors, such deposit. . .shall become the property of such persons as joint tenants. . . . The making of the deposit in such form shall, in the absence of fraud or undue influence, be prima facie evidence. . .of the intention of such depositors to vest title to such deposit and the additions thereto in such survivor or survivors." *See Guilds,* 200 N.W. 2d at 770. *See also* Mich. Comp. Laws Ann. § 487.703.

5. While the chancellor based his decision in part on this provision in the CDs, no copy of it exists in the record before this Court. The provision was quoted in the affidavit of Clarence Young, however, which was attached to the defendant's motion for summary judgment. The content of the provision was not disputed by the plaintiff.

6. Young stated that the CDs also contained a provision regarding pledges of the certificates, specifying that such pledges must be satisfied before the rights of any joint account survivor become effective. The provision explained by way of example that "if one joint tenant pledges the certificate for payment of debt and then dies, the surviving joint tenants' rights in the certificate are subject first to the payment of the debt." Jerry Wallace expressly pledged the CDs for two loans numbered 6816482 and 6843940. The plaintiff has conceded the bank's right to set off those notes, however,

and this Court need not address the effect of these pledges on Texie Rae Wallace's survivorship interest.

7. The four notes in dispute were all signed prior to February 21, 1989. *See supra* note 2.